[No. B018744. Second Dist., Div. Seven. Nov. 19, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ALPHONSO EUGENE KEGLER, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, Monica Knox, Acting State Public Defender, Michael Harrison and James A. Uyeda, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John R. Gorey and William T. Harter, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LILLIE, P. J.**—A jury found defendant guilty of first degree murder and robbery of Phillip Roberts (counts I and II), to be true the allegations that in the commission of the above offenses he used a revolver within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1), and inflicted great bodily injury upon Roberts (Pen. Code, § 1203.075), and that he committed the murder of Roberts while engaged in the commission of robbery (Pen. Code, § 190.2, subd. (a)(17)); it also found him guilty of the robberies of Robert Barnes and Larry Venable (counts III and IV) and to be true allegations that in the commission of those robberies defendant used a revolver. As to counts III and IV, the court sentenced defendant to state prison for a total term of eight years, to run consecutively to a sentence to state prison for a term of life without the possibility of parole plus two years for use of a firearm as to count I. A six-year sentence as to count II was stayed pursuant to Penal Code section 654. Defendant appeals from the judgment, contending the court erred in refusing two jury instructions and in excluding evidence. He also contends prosecutorial misconduct deprived him of a fair trial.

FACTS

We view the evidence in the light most favorable to the judgment. At about 12:30 p.m. on November 10, Larry Venable and Robert Barnes were

standing on the sidewalk in front of a house to which they had just delivered concrete from their cement mixer: a silver Cadillac pulled up and a Black man got out, pointed a gun at them and told them to give him their billfolds. Barnes handed him his billfold; when Venable hesitated, the man said, "Give me your wallet or I'll shoot you." Venable turned his wallet upside down and his credit cards fell out; the robber took the wallet and cocked his revolver; Venable dropped back, Barnes ran away. After looking at Venable for a minute, the robber ran back to his car and drove away. Several days later Venable positively identified defendant as the robber from nine police photographs and positively identified him at trial. Barnes was absolutely sure at trial that defendant was the robber and, although no one asked him at the preliminary hearing if he saw the robber in court, he also identified defendant as the robber at that time. A few days after the incident, however, Barnes was unable to identify defendant from police photographs because it was difficult for him to distinguish between photographs of people with dark complexions.

Between 12:30 and 1 p.m on November 10, Clem Rattler was at work at an automotive products shop when he saw a grey Cadillac in front of the shop. Sometime before 1:30 Phillip Roberts came into the shop, displayed a large wad of money and purchased some auto parts. About two and a half miles from the automotive shop, and about two miles from the scene of the Venable and Barnes robberies, Jerome Henry was going up to his apartment about 1:30 when his neighbor, Phillip Roberts, pulled his pickup truck into the parking lot, followed by a grey Cadillac. Roberts and the driver of the Cadillac stood in back of the pickup truck talking. After Henry had entered his apartment, he heard someone say, "Give me what you got," followed by a gunshot. Henry opened his door an inch, peeked outside, and saw the defendant push Roberts. As Roberts was falling to the ground, defendant shot Roberts again. Roberts died of gunshot wounds from two .22-caliber bullets.

On the day of the incident, Henry told police the shooter was a Black male, about five feet ten inches tall, wearing a tan cap, a tan jacket and blue jeans. The police showed a group of photographs to Henry who at first identified a photograph of Laverne Wright as looking like the shooter and then changed his mind and said that he was not the shooter. Three days later Henry identified defendant as the robber from police photographs, and the officer told him he had picked the right person. Several months later, in January 1985, an investigator from the public defender's office spoke with Henry, who told the investigator that on a scale of one to ten, ten being certain that defendant was the robber, Henry was a "five" in his certainty of identification of defendant. At trial, Henry described the robber as a Black man with sideburns, wearing a grey jacket and a cap, and also testified that

he had been afraid of giving the investigator information because he was concerned for his safety in cases like this. At trial, Henry also testified that he was then a "10" in his certainty that defendant was the shooter.

Frank August was driving into an alley to visit a friend about 1:30 on November 10 when he heard a gunshot and shortly thereafter another shot. He saw Phillip Roberts, a friend, facing a Black man who was pointing a gun at Roberts at about a 45-degree angle to the ground. Roberts was falling to the ground. The Black man, about five feet nine inches, wearing a dark jacket and cap, got into a Cadillac and sped away past August, who wrote down the license number. Several days later, August could not identify the shooter from police photographs, but told police that if he saw the man in person he would be able to recognize him, as he got a look at the man's profile. At the preliminary hearing, August recognized defendant as the shooter and testified then that he was certain defendant was the shooter. August was also certain at the time of trial that defendant was the shooter and, after Laverne Wright was exhibited to him, said that Wright was not the shooter.

Laverne Wright testified that on November 9 he had loaned his grey Cadillac to defendant in exchange for some cocaine. On the morning of November 10, around 10 a.m., defendant gave him more cocaine and Wright loaned him the car until the next day, November 11. Wright was home on November 10 until 3 or 4 p.m. On November 11, defendant did not return his car and several days later Wright discovered that it had been impounded. Wright admitted he had a prior felony conviction for firing into an inhabited dwelling, that he was using cocaine on November 9, and that he was five feet nine inches tall. He admitted telling his mother he had loaned his car to someone to fix the grill because his mother did not know at that time that he used cocaine.

On November 11, the police found Wright's Cadillac abandoned and with a flat tire several blocks from defendant's residence. Inside the glove compartment, they found a wallet containing Phillip Roberts's driver's license; on the floor of the passenger side was a Safeway card issued to Larry Venable, as well as numerous business cards, some bearing the name of Larry Venable. Pursuant to a search warrant for defendant's residence, police found inside the kitchen a Tupperware jar containing two wallets with identification of Larry Venable and Robert Barnes. About $253 was found under a bed. Also found in the house were a black Raiders jacket with grey trim, the reverse side of which was mostly grey, a holster for a handgun and live rounds of ammunition; no .22-caliber ammunition was found.

Defendant did not testify. His friend, Ronald Russell, testified that on November 10, about 12:30, he drove over to defendant's house and drove

defendant to his girlfriend's house at 1 p.m. Although Russell was present when defendant was arrested and admitted speaking to him by telephone after the arrest, he denied talking to him about an alibi for November 10. It was not until three weeks before trial that defendant's brother asked him to testify. Sharon Wilson, defendant's girlfriend on November 10, testified that on that day about 1 p.m. she was home with her mother and sister when defendant came over and stayed there until 5 p.m. Marie Rosser, her sister, testified she saw defendant arrive at 1 p.m; she remembered this a year later because a television show she had been watching had just gone off the air and her mother was talking about a trip to Las Vegas on November 12.

Marilyn Kitchen, a neighbor of Laverne Wright, saw Wright walking towards his home at about 12:10 p.m. on November 10. He was wearing blue jeans, a dark faded shirt and a cap. Later that day, at around 4 p.m., Kitchen saw Wright again, dressed the same as earlier, either going or coming home. She asked him if there was something she could do for him, and he said no, that he was alright; Wright looked "bad," like he had been high on PCP; that day, she did not see his car nearby; Wright's supervisor at work testified that Wright's truthfulness or honesty is not very reliable.

In closing argument, the defense admitted the evidence showed beyond a reasonable doubt that defendant robbed Venable and Barnes, but argued that the prosecution had not met its burden as to the murder and robbery of Roberts because the identifications of the suspect by Henry and August were invalid and tainted.

I

## No Instructional Error

### A. *Refusal to Give Modified Version of CALJIC No. 2.91*

Appellant contends the court erred by refusing his request for a modified version of CALJIC No. 2.91[1] to pinpoint his defense of third party culpability and that such refusal subjected him to the possibility that "although the jury's focus on Wright might raise a reasonable doubt of guilt, the jury would render a guilty verdict under the mistaken belief that defendant had the obligation to show Wright's guilt by some greater standard, such as a preponderance of the evidence . . . ."

"Section 1096a of the Penal Code declares that when the statutory definition of reasonable doubt is given (see Pen. Code, § 1096), no other

---

[1] This refused instruction would have told the jury in pertinent part that "The burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged. In this regard, you are instructed that it is not necessary for the defendant to prove that another person may have committed the crime, nor is it the burden of the defendant to prove his innocence. . . ."

instruction need be given defining reasonable doubt. ■ Despite this section, a defendant, upon proper request therefor, has a right to an instruction that directs attention to evidence from a consideration of which a reasonable doubt of his guilt could be engendered." (*People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847].) ■ In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole. We must also assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. (*People* v. *Romo* (1975) 47 Cal.App.3d 976, 990 [121 Cal.Rptr. 684].) There is no requirement that the jury be instructed in the precise language requested by a party. (*People* v. *Partlow* (1978) 84 Cal.App.3d 540, 558 [148 Cal.Rptr. 744].)

■ The requested instruction was inapposite because appellant did not present sufficient evidence of third party culpability linking any particular third person to actual perpetration of the crime. (See *People* v. *Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99].) Prior to final argument, the court asked defense counsel why he wanted the modified version of CALJIC No. 2.91 given to the jury. Defense counsel responded: "I want it because it indicates that it's not necessary for a defendant [to prove that another person committed the crime]. There is evidence—I mean Mr. Laverne Wright's car was used in the commission of the murder and property was found in it, and based on those facts, we're entitled to it." Although defense counsel argued to the jury that Wright was the one who robbed and shot Roberts, the only evidence he referred to in this regard was that Wright and his clothing matched the physical descriptions given by witnesses to the murder and the wallet of the victim was found in his car. However, no evidence placed Wright at the scene of the murder or in possession of his car, undisputably used in the commission of the murder, at the time of the offense. Moreover, as conceded by defense counsel in final argument, the eyewitnesses' descriptions of the suspect fit defendant, Mr. Wright, and "probably 100,000 people in Los Angeles."

■ Evidence of mere motive or opportunity to commit the crime by another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime. (*People* v. *Hall, supra,* 41 Cal.3d at p. 833.)

■ We further conclude that the issue presented by the modified version of CALJIC No. 2.91 was adequately explained to the jury in other instructions. An alibi defense presents basically the same issue as is involved in mistaken identification because pursuant to CALJIC No. 4.50 on alibi, the prosecution is required to prove beyond a reasonable doubt that the defendant was present at the scene of the crime. (*People* v. *Aho* (1984) 152

Cal.App.3d 658, 661 [199 Cal.Rptr. 671].) In the context of the facts of the instant case, any evidence of third party culpability, had it been presented, would have raised the same issue as involved in identification. The court herein did adequately relate the issues of alibi and identification to that of reasonable doubt. The court gave CALJIC Nos. 4.50 (alibi), 2.91 (identity based on eyewitnesses), 2.92, modified, (factors to consider in proving identity by eyewitness testimony), and 2.90 (reasonable doubt, burden of proof). Assuming that the jurors understood and correlated all the instructions, the jury reasonably could not have had a mistaken belief, as asserted by appellant, that the defendant had the obligation to show Wright's guilt. It was thus not error for the court to refuse the modified version of CALJIC No. 2.91.

B.  *Refusal to Instruct on Evidence Code Section 1101, Subdivision (a).*

■  Appellant contends the court erred by refusing to instruct, upon his request, that "if you reach a guilty verdict as to one or more of the charged offenses this may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes and thus committed the other charged crime or crimes." Appellant derives this instruction from Evidence Code section 1101, subdivision (a) and *Williams* v. *Superior Court* (1984) 36 Cal.3d 441 [204 Cal.Rptr. 700, 683 P.2d 699], a case dealing with issues of severance and joinder. *Williams* is inapposite because appellant does not contend the counts were improperly joined or that the Venable and Barnes robberies do not bear common marks to the Roberts robbery and murder. Moreover, other courts have rejected the claim that an instruction based on Evidence Code section 1101, subdivision (a) should be given when separate offenses are tried together. (*People* v. *Thornton* (1979) 88 Cal.App.3d 795, 804 [152 Cal.Rptr. 77]; see also *People* v. *Jackson* (1975) 45 Cal.App.3d 67, 70 [119 Cal.Rptr. 71].) Moreover, it is unlikely that the jury in this case would use its own verdict on one count as evidence, because a verdict is clearly not evidence. The jury was instructed pursuant to CALJIC No. 1.00 that "One duty [as jurors] is to determine the facts of the case from the evidence received in the trial and not from any other source. The word 'fact' means something that is proved directly or circumstantially by the evidence or by agreement of counsel." Further, the court properly instructed the jury in the language of CALJIC No. 17.02 that "Each count charges a distinct offense. The defendant may be found guilty or not guilty of any or all of the offenses charged. Your finding as to each count must be stated in a separate verdict."

Appellant also argues that evidence of other crimes was admitted through prosecution photographs of him which depict him with a booking number on a mugshot taken over a year before the charged crimes. No objection was made to the admission of the photographs at the time of trial,

nor did defense counsel mention the booking photographs as justification for the proffered instruction. As the proffered instruction does not address the issue of other crimes, it would not have addressed the problem of the booking photographs. The court did not err in refusing the requested instruction.

## II

### HEARSAY STATEMENTS OF DE MORE

Appellant claims the court erred in refusing to admit hearsay statements of Joyce De More, an eyewitness to the murder, who lived across the street from the crime scene and was unavailable at time of trial but who told an investigating officer shortly after the murder that she saw Roberts's vehicle enter the parking lot, followed by a grey Cadillac; a short time later she saw an altercation between a Black male and the victim, heard some gunshots and saw the victim fall to the ground and the Cadillac leave. Appellant claims the statement as to an altercation is relevant to the special circumstances allegation and the issue of intent to kill.

He argues that De More's statements to the officer are cloaked with sufficient indicia of trustworthiness to be admissible in the absence of oath or opportunity for cross-examination, relying on *Chambers* v. *Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038], also *People* v. *Ramey* (1976) 16 Cal.3d 263, 269 [127 Cal.Rptr. 629, 545 P.2d 1333], a search and seizure case.

In *Chambers,* defendant, on trial for murder of a policeman, sought to show that one McDonald was the killer. McDonald had earlier signed a sworn confession and confessed the killing to three friends, but at trial he presented an alibi and repudiated the sworn confession by testifying he had confessed on the promise he would not go to jail and would share in proceeds of a lawsuit Chambers would bring against the town. Chambers called McDonald at trial but was not allowed to cross-examine him as to his confession because of state court rules preventing a party from impeaching his own witness and requiring hearsay declarations against interest to be against the declarant's pecuniary interest. As to the voucher rule, which prevented Chambers from impeaching McDonald, the high Supreme Court said: "The availability of the right to confront and to cross-examine those who give damaging testimony against the accused has never been held to depend on whether the witness was initially put on the stand by the accused or by the State. We reject the notion that a right of such substance in the criminal process may be governed by that technicality . . . ." (410 U.S. at p. 297-298 [35 L.Ed.2d. at p. 310].) As to the state's limitation on declarations against interest, the court noted that the confessions were made and

offered at trial under circumstances that provided considerable assurance of their reliability and "[f]inally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and had been under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury." (410 U.S. at p. 301 [35 L.Ed.2d at p. 312].) "We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process. In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." (410 U.S. at pp. 302-303 [35 L.Ed.2d at p. 313].)

*Chambers* has no application to the issue of De More's hearsay statements. Not only was the declarant unavailable to explain those statements, but there was no indication that the statements were reliable, as they lacked the conventional indicia of reliability: they were not made under oath or other circumstances that impress the declarant with the solemnity of the statements; the declarant's word is not subject to cross-examination; and she is not available in order that her demeanor and credibility may be assessed by the jury. (*Chambers* v. *Mississippi, supra,* 410 U.S. 284, 298 [35 L.Ed.2d 297, 311, 93 S.Ct. 1038].)

In the instant case, De More's statement that she observed "an altercation between a male black and the victim," is sufficiently conclusory and ambiguous on its face as to lead the jury to speculate as to what De More saw. No one but De More can supply the specifics of her observations, or what she meant by "altercation." If she were available to give a specific description of what she saw, the jurors may or may not agree with her characterization of the events as an altercation. Because there is no way to explain the meaning of her statement, there is no way to evaluate its reliability. Further, as pointed out by respondent, appellant's reliance on search and seizure cases involving citizen informants is misplaced because the exclusionary rule's prime purpose is to deter unlawful police conduct (*Burke* v. *Superior Court* (1974) 39 Cal.App.3d 28, 33 [113 Cal.Rptr. 801]), and a search supported by probable cause is not subject to defeasance when later events establish that the information reasonably relied upon by police was untrue. (*Id.,* at p. 35.) On the other hand, hearsay rules and the confrontation clause are generally designed to further the accuracy of the fact-finding process. (*People* v. *Jones* (1984) 155 Cal.App.3d 653, 663 [202 Cal.Rptr. 289].) As appellant fails to show that De More's hearsay statements were reliable, he fails to establish that the court erred in excluding them.

## III

### Wright's Polygraph Test Results

▮ Appellant contends that the application of Evidence Code section 351.1, barring evidence of polygraph results in a criminal trial in the absence of a stipulation, violated his federal and state constitutional right to compulsory process for obtaining witnesses in his favor. Prior to trial, Laverne Wright was given a polygraph test which indicated he was deceptive as to the same matters to which he testified at trial. The prosecutor refused to stipulate to admit the test results. The defense had a court-appointed expert ready to testify as to the reliability of the polygraph test administered to Wright. After hearing argument, the court, relying on Evidence Code section 351.1, refused to hold a foundational hearing relating to the admissibility of the polygraph tests results.

Evidence Code section 351.1 states: "(a) Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding . . . unless all parties stipulate to the admission of such results. [¶] (b) Nothing in this section is intended to exclude from evidence statements made during a polygraph examination which are otherwise admissible."

According to analysis by the Assembly Committee on Criminal Law and Public Safety, the above legislation, enacted in 1983 as an urgency measure, "is intended to overrule [*Witherspoon* v. *Superior Court* (1982) 133 Cal.App.3d 24 (183 Cal.Rptr. 615)] and to create an exception to the truth-in-evidence section of Proposition 8 that bars the exclusion of any relevant evidence." (Assembly Com. on Crim. Law and Pub. Safety, staff comments on Sen. Bill. No. 266 as amended Mar. 16, 1983 (1983-1984 Reg. Sess.), for hg. on June 8, 1983, p. 2.)

In granting a petition to compel the trial court to hold a pretrial evidentiary hearing as to the admissibility of a polygraph examination given to the defendant on the issues of the voluntariness of his confession and innocence of the charges of armed robbery, the *Witherspoon* court noted that no "statutory provision of which we are aware provides a basis for simply, in all cases, excluding the use of the results of a polygraph examination and denying the party proffering the evidence an opportunity to establish its relevancy, materiality and competency. A judicial proceeding is supposed to be a search for the truth. Any evidence which will facilitate that objective should be accepted by the courts absent a constitutional prohibition, or a specific statutory exclusion. [¶] The function of providing for the exclusion

of certain types of evidence on the basis of form, lack of reliability or public policy, is one for the Legislature rather than the courts." (133 Cal.App.3d at pp. 34-35.) It was in reaction to *Witherspoon* that the Legislature enacted Evidence Code section 351.1.

"Every state is generally free to exercise its sovereign prerogative as to the evidence it will admit in its courts. The federal constitution, however, imposes a limited restraint upon state evidentiary rules where exculpatory evidence is excluded by arbitrary state rules. *Washington* v. *Texas,* 388 U.S. 14, 87 S.Ct 1920, 18 L.Ed.2d 1019 (1967). The genesis of this restriction is found in the defendant's sixth amendment right to 'compulsory process for obtaining witnesses in his favor.' The Constitution imposes this limitation because the state may not deny an accused in a criminal trial the right to a fair opportunity to defend against the state's accusations. *Chambers* v. *Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). However, 'the right of a defendant to present relevant and competent evidence is not absolute and [may] "bow to accommodate other legitimate interests in the criminal trial process," ' *Hughes* v. *Mathews,* 576 F.2d 1250, 1258 (7th Cir.), . . . although the competing state interests must be substantial to overcome the claims of the defendant. Our task is thus to evaluate the exculpatory significance of the proffered polygraph evidence and then to balance it against the competing state interest in the procedural rules that prevented the defendant from presenting this evidence at trial." (*McMorris* v. *Israel* (7th Cir. 1981) 643 F.2d 458, 460-461; fns. omitted.)

The above analysis does not involve a determination of whether the evidentiary rule in question is facially unconstitutional, as neither *Chambers* nor *Washington* held the evidentiary rules in question facially unconstitutional. (*McMorris* v. *Israel, supra,* 643 F.2d at p. 461, fn. 5.) Rather, our task is limited to an examination as to whether "the exclusion of the polygraph evidence under the particular circumstances of the instant case deprived this defendant of his constitutional rights." (*Ibid.*)

*A. Exculpatory Significance of Polygraph Evidence*

Appellant argues that "[t]here was . . . a reasonable possibility that Wright—not defendant—was the slayer. Admission of reliable polygraph evidence that Wright lied would have strengthened that possibility and increased defendant's chances of acquittal." The fallacy of this argument is that even expert opinion evidence that Wright was lying goes only to the issue of Wright's credibility and cannot in itself provide affirmative evidence that Wright was the killer. ■ Disbelief of a witness does not establish that the contrary is true, only that the witness is not credible. (*People* v. *Woodberry* (1970) 10 Cal.App.3d 695, 704 [89 Cal.Rptr. 330].) ■ Here, Wright's testimony was significant primarily because it explained appel-

lant's possession of the car, which was seen by others at the scene of the crimes. Polygraph evidence that Wright was lying would not have affected the jury's assessment of the other evidence, in particular the testimony of Henry and August, which was itself sufficient to convict appellant of the murder and robbery of Roberts. In addition to its lack of pertinence to other evidence in the case, the polygraph evidence was merely cumulative of other, more traditional evidence which cast serious question on Wright's credibility. He admitted he was convicted of a felony; that he was a cocaine user; and that he lied to his mother about lending his car to someone to fix the grill. His testimony that he was at home on November 10 until 3 or 4 p.m. was impeached by the testimony of his neighbor, Marilyn Kitchen, that she saw Wright walking towards his house a little after 12 noon. Wright's supervisor at work testified that he did not consider Wright truthful or honest. Thus, the excluded evidence herein cannot be considered "critical" to appellant's defense in the way that the excluded evidence was in *Chambers* v. *Mississippi, supra,* 410 U.S. 284, 302 [35 L.Ed.2d 297, 313]. Although appellant has a weaker argument than did Chambers as to the significance of the excluded evidence to his defense, we must nevertheless examine the nature of the state's interest in excluding polygraph evidence.

## B.  State's Interest in Excluding Polygraph Evidence

In order to sustain appellant's constitutional attack on the trial court's ruling refusing him a foundational hearing for the proffered polygraph evidence, it would be necessary for us to determine that the statute excluding such evidence does not rest on considerations of fairness and reliability. (*State* v. *Conner* (Iowa 1976) 241 N.W.2d 447, 458.) One controversy surrounding the admission of polygraph evidence focuses on the problems facing the court which must make a determination on the foundational aspects of admissibility of such evidence.[2] The Wisconsin Supreme Court in

_____

[2] To more fully understand such problems, we present the following explanation of the polygraph machine by the Supreme Court of Wisconsin: "The polygraph machine is a device which measures and records certain involuntary bodily responses, *e.g.,* blood pressure, pulse rate, respiration, and skin resistance to electricity. A quality machine accurately measures and records these body responses. The theory of the polygraph machine is that the recorded and measured objective physiological responses can be analyzed to determine the individual's subjective state of mind. Acceptance of the polygraph test as a method of detecting deception requires acceptance of the premise that there is a relationship between lying and emotions and between emotions and measurable physiological changes. The relation between lying, emotions and physiological changes in the body is not completely understood or scientifically explainable, but empirical evidence appears to support its existence.

"Acceptance of both the accuracy of the machine as a measuring device and the operative theory of the polygraph is but the first step in determining whether the polygraph test is a reliable method of detecting deception. It is apparently universally conceded that the machine itself is not independently capable of separating truth from deception. The interaction of the examinee and the examiner and the conditions in which the test is given all play a critical role in the polygraph test.

*State* v. *Dean* (1981) 103 Wis.2d 228 [307 N.W.2d 628], also noted that Wisconsin's seven-year experience with a rule of admission of polygraph evidence upon stipulation and under certain conditions afforded trial courts with only limited guidance in dealing with the foundational aspects of admissibility: "The case law at present provides no standards or guidelines to aid the trial court in determining whether the expert witness is qualified, whether the defendant is a suitable subject, whether the methods used in conducting and interpreting the test are valid, or whether the evidence should be limited to certain types of cases . . . . Under such circumstances, the burden on the trial court to decide in each case whether to admit the stipulated polygraph evidence is substantial." (*Id.,* at p. 650.) In *Dean,* the Wisconsin court declared polygraph evidence inadmissible.

The experience of the federal District Court for the Central District of California in one case similarly led that court to conclude that the administrative burden on the court outweighed the probative value of the test. (*United States* v. *Urquidez* (C.D.Cal. 1973) 356 F.Supp. 1363, 1367.) After spending three full days hearing testimony of experts concerning the polygraph instrument, the technique of administering the test, the validity of the test administered to the defendant, and the meaning of the results, and after having read numerous articles about polygraphy and transcripts of testimony of experts in another case, the court concluded that "although the inquiry was far from complete, the experience of this case has amply shown that, as of now, the validity of a polygraph test is dependent upon a large number of variable factors, many of which would be very difficult, and

---

"The successful use of the polygraph test to produce reliable results depends on the examinee's biological and psychological makeup. . . .

"The examiner's training, competence, integrity and conduct during the test is as critically important to the reliability of the polygraph as the machine and the examinee. The examiner must obtain background information on the crime and the examinee; must screen out the psychologically or biologically unsuitable examinee; must conduct a pre-test interview; must prepare the test questions; must supervise the environment of the test to eliminate distortive influences; must ask the questions during the examination; must conduct a post-test interview; and must interpret the results of the test. A crucial part of the testing and of the interpretation of the physiological data is the examiner's evaluation of the examinee's visible behavior, such as squirming, coughing, sniffing, and hesitancy. . . .

"The determination of truth or deception cannot be made directly from the examinee's verbal responses or from the recordings of the machine but rather depends on the examiner's interpretation and analysis of the physiological changes measured and recorded on the charts. The analysis of the chart requires establishing timing between stimulations and responses, accounting for idiosyncrasies of the examinee as well as usual or unusual physiological responses due to anger, anxiety or other emotions. The examiner's analysis of the charts is not based merely on the recorded physiological measurements but on the examiner's subjective impressions of the outward behavior of the examinee. Thus while the polygraph is enveloped in an aura of scientific precision and objective measurement of body responses, in large measure the result of the polygraph is dependent on the opinion of the examiner, and that opinion is drawn from a process which is almost completely in the control of the examiner." (*State* v. *Dean* (1981) 103 Wis.2d 228 [307 N.W.2d 628, 632-633]; fns. omitted.)

perhaps impossible, to assess. In a given case, the time required in order to explore and seek to adjudge such factors would be virtually incalculable (we did little more than make a beginning in the present case). Accordingly, this court is impelled to the conclusion that the administration of justice simply cannot tolerate the burden of litigation inherently involved in such a process." (*Id.,* at p. 1367.)

A few states have similarly excluded polygraph evidence in whole or in part because its burden on the administration of justice was deemed to outweigh its probative value. (*State* v. *Grier* (1983) 307 N.C. 628 [300 S.E.2d 351, 359-360], also holding that polygraph evidence is inherently unreliable; *State* v. *Catanese* (La. 1979) 368 So.2d 975, 981.) In Michigan, polygraph evidence is not admissible because not generally accepted as reliable by the scientific community. (*People* v. *Williams* (1983) 123 Mich.App. 752 [333 N.W.2d 577, 580].)

Some states focus on the risk of confusion and prejudice to the jury from polygraph evidence, and exclude it because it "impinges upon the integrity of our judicial system." (*People* v. *Baynes* (1981) 88 Ill.2d 225 [430 N.E.2d 1070, 1079]; see also *State* v. *Conner, supra,* 241 N.W.2d 447, 459.) The Supreme Court of North Carolina articulated one problem relating to polygraph evidence before a jury: "[W]e are acutely aware of the possibility that the criminal proceeding may degenerate into a trial of the polygraph machine. [Citations.] The introduction and rebuttal of polygraph evidence, if all the possibilities for error in the polygraphic process were deeply explored, could divert the jury's attention from the question of the defendant's guilt or innocence to a judgment of the validity and limitations of the polygraph." *(State* v. *Grier, supra,* 300 S.E.2d at pp. 359-360.) The Eighth Circuit Court of Appeals suggested another problem: "When polygraph evidence is offered in evidence at trial, it is likely to be shrouded with an aura of near infallibility, akin to the ancient oracle of Delphi. During the course of laying the evidentiary foundation at trial, the polygraphist will present his own assessment of the test's reliability which will generally be well in excess of 90 percent. . . . Based upon the presentment of this particular form of scientific evidence, present-day jurors, despite their sophistication and increased educational levels and intellectual capacities, are still likely to give significant, if not conclusive, weight to a polygraphist's opinion as to whether the defendant is being truthful or deceitful in his response to a question bearing on a dispositive issue in a criminal case. To the extent that the polygraph results are accepted as unimpeachable or conclusive by jurors, despite cautionary instructions by the trial judge, the juror's traditional responsibility to collectively ascertain the facts and adjudge guilt or innocence is preempted." (*United States* v. *Alexander* (8th Cir. 1975) 526 F.2d 161, 168-169.) A similar justification has been advanced

to support the traditional exclusion of psychiatric evidence of credibility. (*People* v. *Fleming* (1983) 140 Cal.App.3d 540, 544 [189 Cal.Rptr. 619]; *People* v. *Manson* (1976) 61 Cal.App.3d 102, 137 [132 Cal.Rptr. 265].)

Materials considered by the Legislature in enacting Evidence Code section 351.1 reveal that all of the above concerns were considered by the Legislature. A digest of the bill by the Senate Republican Caucus noted that under *Witherspoon* v. *Superior Court, supra,* 133 Cal.App.3d 24, the courts must decide the issue of admissibility on a case-by-case basis, which will "substantially increase trial time by requiring courts to litigate collateral issues regarding the reliability of the particular test and qualifications of the specific polygraph examiner in every case," and that "opinions vary widely on the reliability of polygraph evidence." (Sen. Republican Caucus, Dig. of Sen. Bill No. 266, dated Mar. 16, 1983, pp. 1-2.) Staff comments on the bill prepared by the Assembly Committee on Criminal Law and Public Safety noted that a number of variables contributed to reliability problems with the polygraph, including the lack of standardization in the administration of the tests, the lack of standards for licensing examiners and the lack of a means of testing for accuracy, other than confessions, which may themselves be unreliable. The committee staff also stated that "proponents express concern that a 'machine' will usurp the role of the jury and that jurors will assign too much credence to the results of a polygraph examination." (Assem. Com. on Crim. Law and Pub. Safety, staff comments on Sen. Bill No. 266 as amended Mar. 16, 1983 (1983-1984 Reg. Sess.) for hg. on June 8, 1983, pp. 2-4.)

Given the experience of other jurisdictions with polygraph evidence, particularly that of Wisconsin, we cannot say that the concerns of the California Legislature are not legitimate or compelling. The statute clearly rests on considerations of reliability and integrity of the criminal justice system. Further, the policy reasons for excluding polygraph evidence in the present case are more compelling than the evidentiary rules relied upon by the state courts in *Chambers* v. *Mississippi, supra,* 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1938]. Because these concerns for reliability and fairness outweigh the relatively weak exculpatory significance of the proffered evidence in the instant case, we conclude that the application of Evidence Code section 351.1 did not deny appellant due process or violate his state and federal right to compulsory process.

■ We find appellant's other challenges to Evidence Code section 351.1 also to be without merit. Because it was enacted by a two-thirds vote (see Sen. Final History, 1983-1984 Sess., Sen. Bill No. 266, p. 185; Stats 1983, ch. 202), that section does not violate article 1, section 28, subdivision (d) of the California Constitution which provides in pertinent part that "Except as provided by statute hereafter enacted by a two-thirds vote of the member-

ship in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . ."

▉▉ Without merit are appellant's claims that the stipulation provision of the statute violates federal and state constitutional principles of equal protection and that it gives the prosecution a complete and arbitrary veto power over the evidence, thus usurping judicial authority in violation of the doctrine of separation of powers. As explained above, polygraph evidence is *not* otherwise admissible. The parties, however, may by stipulation, waive their evidentiary objections and right to cross-examine or impeach the polygrapher and agree to admit such evidence. Assuming the stipulation provision theoretically may involve disparate treatment of defendants, the Legislature could have reasonably acted to permit such otherwise inadmissible evidence only in those cases where there would be no burden on the trial court because of a lengthy, contested foundational hearing. (See, e.g., *United States* v. *Urquidez, supra,* 356 F.Supp. 1363, 1365-1367.)

Nor does the stipulation provision of the statute result in the usurpation of judicial authority: "In our adversary system, evidence received without objection is in the case for what it is worth. This is no less true when an objection is stipulated away than when it is otherwise given up. Contrary to defendant's argument, the issue of admissibility of polygraph evidence is no more in the hands of the adversary than is the issue of admissibility of any evidence to which an adversary may lodge a valid objection." (*State* v. *Conner, supra,* 241 N.W.2d 447, 459; accord, *Robinson* v. *Wilson* (1974) 44 Cal.App.3d 92, 106-107 [118 Cal.Rptr. 569].)

We conclude that Evidence Code section 351.1 was properly applied to the circumstances of the instant case.

## IV

### PROSECUTORIAL MISCONDUCT

Appellant assigns as prejudicial misconduct the following conduct of the prosecutor: (1) his reference to "probation" during voir dire of the jury panel and during closing argument; (2) his suggestion in closing argument that the prosecution possessed insider information, not presented to the jury, which eliminated Wright as a suspect; (3) his argument to the jury improperly injected his personal opinion of the evidence and credibility of the witnesses, matters not introduced in evidence.

▉▉ As to the first incident of purported misconduct, appellant claims that the prosecutor's references to probation constituted a comment on punishment suggesting a lenient disposition which had the effect of dimin-

ishing the impact of the jury's role and responsibilities.[3] The prosecutor's comments with respect to probation do not suggest a lenient disposition; rather they were references to the fact that in this case the matter of penalty or punishment was not to be considered by the jury, which is precisely what they were told by CALJIC No. 8.83.2, an instruction requested by the defense. The conduct referred to does not constitute misconduct, defined as "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*People* v. *Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672].) Even if the statements can be construed as misconduct, they were not assigned as misconduct at trial. " 'Misconduct in argument may not be assigned on appeal if it was not assigned at the trial, unless the misconduct contributed to the verdict or was so unredeemable that nothing whatever would have cured it.' " (*Id.,* at p. 955.) To the extent that the comments may have suggested certain sentencing options to the jury, such inferences could have been dispelled by an admonition. Moreover, if defense counsel had objected at his earliest opportunity, the court could have prevented any further references to punishment in the future, thus preventing the reference to "probation" and "time in custody" in closing argument. Finally, had the prosecutor not made the statement, it is not reasonably probable that a result more favorable to the defendant would have resulted. (*People* v. *Strickland, supra,* 11 Cal.3d at p. 955.)

■ As to the second claimed instance of misconduct, it is clear from the entire context of the argument that the prosecutor was not suggesting he had any insider information, but was simply referring to Venable and Henry's identifications. The prosecutor said, "[Mr. Wright's supervisor] said [Wright] is not a reliable person, and I agree that everybody who uses cocaine or drugs in my opinion is not a reliable person. [¶] But let's look at the nature of the character of his testimony. . . . He tells us he loaned the car to the defendant. He told us when he was supposed to get the car back.

---

[3] The portion of the voir dire to which appellant refers states as follows:

"MR. MERRICK [Prosecutor]: . . . Does it bother you that nobody is asking you to recommend a sentence in this case?

"PROSPECTIVE JUROR HADLEY: No.

"MR. MERRICK: If you do reach a guilty verdict when the defendant is sentenced, the sentence is based upon a probation report, and the probation officer will explore the defendant's background. [¶] Would you trust the judge to make the right decision regarding the sentence if you found the defendant guilty?

"PROSPECTIVE JUROR HADLEY: Yes."

The portion of closing argument to which appellant objects states as follows: "MR. MERRICK: . . . During the jury selection process, [the judge] indicated to you if you find the defendant guilty, it's up to the judge to determine what the sentence is. That means if the defendant gets probation or spend[s] time in custody, the judge alone makes that determination, and he determines how long a person spends in custody. [¶] You can't make a recommendation and I know we all have opinions on a murder case that the defendant should spend X number of years in custody. I have no control over that and you have no control over that and the defense attorney has no control over that."

He told us about getting drugs the second time from the defendant, and he has also been eliminated as a suspect in this case. [¶] Mr. Venable was shown a photograph of him that was taken when he was interviewed on the 13th, and he says, 'That is not the person that robbed us.' [¶] Mr. Henry was shown the witness in person and I said, 'Is this the person . . . that you saw shoot the victim?' [¶] And he said, 'Heck, no, that is not him. . . .' " Although we believe the argument is not misconduct, to the extent it could be construed as improper, an admonition, had one been requested, would have cured it.

Finally, appellant claims it was misconduct for the prosecutor to tell the prospective jurors in voir dire that "I'm convinced at some point in time you'll be convinced beyond a reasonable doubt . . . ." and to tell them in closing argument that he had been a prosecutor for 11 years and that when witnesses lie they do not fool the district attorney, the defense attorney, or the judge, and that it is common in a criminal trial for witnesses to lie. Appellant argues that the district attorney's courtroom experience was not introduced into evidence and it was improper to argue personal opinion of guilt. In their contexts, however, the prosecutor's comments were simply commonsense inferences from the conflicting evidence and not misconduct. If misconduct, not only did defense counsel fail to assign it as such, but it was not so unredeemable that an admonition would not have cured it.

## DISPOSITION

The judgment is affirmed.

Thompson, J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 3, 1988.