Filed 4/10/13  P. v. Rock CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054255 |
| v. | (Super.Ct.No. FVA901525) |
| JACOB AARON ROCK, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Dwight W. Moore, Judge.  Affirmed.

Janice R. Mazur, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Peter Quon, Jr., and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I.  INTRODUCTION

In this case, the prosecution and the defense presented radically different versions of the events that occurred at a party in Fontana in August 2009.  It appears the jury generally accepted the defense version, finding defendant Jacob Aaron Rock guilty only of a lesser misdemeanor offense of assault on a police officer (Pen. Code, § 241,[1] subd. (c)) rather than the charge of assault on a police officer with a deadly weapon (§ 245, subd. (c)) in count 1, found not true the allegation of great bodily injury as to that count (§ 12022.7), and voted 11 to 1 and 10 to 2 in favor of acquittal on two additional counts of resisting executive officers (§ 69).[2]  Defendant contends the trial court erred in refusing to instruct the jury with his requested instruction on willful destruction of evidence.  We agree that the trial court abused its discretion by failing to impose an appropriate sanction in the event the jury made a factual finding of willful destruction of evidence; however, we find the error harmless, and we affirm.

Defendant Jacob Aaron Rock appeals from his conviction of misdemeanor assault on Police Officer Shane McCoy (§ 241, subd. (c)) as a lesser included offense to the charge of assault on a police officer with a deadly weapon (§ 245, subd. (c)).[3]  Defendant

---

[1]  All further statutory references are to the Penal Code.

[2]  The trial court dismissed those counts on the People's motion under section 1385.

[3]  The jury found not true the allegation that defendant inflicted great bodily injury (§ 12022.7) was hung on two additional counts of resisting executive Officers McCoy and Buddy Porch (§ 69).  The jury votes on those counts were 11 to 1 and 10 to 2 in favor

*[footnote continued on next page]*

2

contends the trial court erred in refusing to instruct the jury with a requested instruction on willful destruction of evidence. Although we agree the trial court failed to instruct the jury properly on willful destruction of evidence, we find the error harmless and we therefore affirm.

## II. FACTS AND PROCEDURAL BACKGROUND

### A. Prosecution Evidence

About 1:00 a.m. on August 30, 2009, Fontana Police Officers Martin Diaz and Ancona were dispatched to a residence in Fontana in response to a "loud noise party call." The property contained corrals and several outbuildings in addition to the residence. When they arrived, Officer Diaz heard loud music and he heard a woman scream, "Help." They saw 400 to 500 people at the party, many of whom were wearing baggy clothes and appeared to be intoxicated. Officer Diaz saw two men who were bleeding from their faces, and he saw one of the men punch the other. He assumed everyone was armed. He yelled, "'Police. Party's over. Everybody needs to go home.'" People started running in every direction, and some guests began yelling profanities at the officers. A group of people surrounded the officers and backed them up against a wall. Officer Diaz radioed in a request for emergency assistance. Bottles, cans, and rocks were thrown at the officers, and Officer Diaz was hit in the chest with a full beer bottle. He

---

*[footnote continued from previous page]*
of acquittal, and the trial court dismissed those counts on the People's motion under section 1385.

3

drew his gun and arrested the person who had thrown the bottle. He never had any contact with defendant.

Officer Shane McCoy arrived in response to the request for assistance. He estimated there were "at least 200 people" at the party. He could hear Officer Diaz yelling "get back" and "stop resisting." As Officer McCoy pushed his way through the crowd to get to Officers Diaz and Ancona, a man pushed him, and Officer McCoy struck the man in the face with his elbow, causing the man to fall down. Officer McCoy parted the crowd a little, and he saw Officers Diaz and Ancona struggling with a subject on the ground while a group of men surrounded the officers and advanced on them; some were throwing beer bottles.

Officer McCoy yelled at the crowd to get back, but they did not obey. About four men advanced toward him, and he believed they were going to attack him, so he swung his flashlight at them and struck several of them. The men backed up a few feet, and Officer McCoy radioed for backup. A man knocked the flashlight out of the officer's hand and put both of his hands around the officer's neck. Officer McCoy kneed the man in the midsection.

Defendant approached, and Officer McCoy told him to get back. Defendant said, "'I ain't doing nothing,'" and continued to walk quickly toward the officer. Officer McCoy struck defendant's chest with his elbow and forearm, and defendant stepped back. Defendant then advanced on the officer swinging his arm at him. Defendant was holding a rock, and he hit the officer on the bridge of the nose. Defendant again advanced on Officer McCoy, but another man in the crowd attempted to block his path. Officer

4

Buddy Porch arrived, and Officer McCoy told him they needed to take defendant into custody.

Defendant ran to the back of the property, and Officer McCoy followed him but was blocked by another man who refused to move when told to. Officer McCoy struck that man with his baton, causing him to fall down. Officer McCoy saw Officer Buddy Porch tackle defendant, and he saw defendant struggling with several other officers. Defendant was on the ground kicking at the officers and trying to get up. Officer McCoy struck defendant's upper body with his baton, and the other officers handcuffed him.

Officer Porch arrived at the party and saw Officer McCoy with blood on his face pointing toward defendant. Officer McCoy said defendant had hit him. Defendant was running away from the area, and Officer Porch followed him. Defendant punched Officer Porch in the face, and the officer punched him back. Defendant fell to the ground.

Officers Shannon Van der Kallen and Erik Savage testified they saw defendant hit Officer McCoy in the face. Officer Van der Kallen had not seen Officer McCoy do anything to defendant before that. While trying to apprehend defendant, Officer Van der Kallen struck defendant two or three times with his flashlight, kicked him two or three times, and struck him in the face with his fist. Officer Savage testified that after defendant struck Officer McCoy, defendant lunged at Officer Porch and punched him in the face. Officer Savage kicked defendant while defendant was on the ground because defendant was resisting arrest.

5

K-9 Officer Katie Beebe saw defendant on the ground struggling with other officers. She told him to stop resisting, and when he refused, she unleashed her dog at him and commanded the dog to bite. The dog bit defendant several times, and the officers gained control of defendant. As soon as they handcuffed him, she called off her dog.

Officers Diaz, McCoy, Van der Kallen, Beebe, and Porch did not see any witnesses trying to record the events with recording devices and did not see any officer remove a recording device from a civilian.

It was stipulated that it was police department policy to book into evidence any cell phone or camera found at the scene, and no such devices were booked into evidence in this case.

After his arrest, defendant told Officer Nicholas Sadler he drank three or four beers that night. A recording of the interview was played for the jury. Defendant admitted he had swung at an officer to defend himself after the officer came at him with a baton. He denied he had used a rock or any other object. Officer Sadler testified defendant's eyes were red, bloodshot, and watery, and his speech was slurred. The officer believed defendant was under the influence of alcohol.

## B. Defense Evidence

Maria del Carmen Casillas[4] testified she had known defendant since he was a child; he was not violent and was respectful of authority. On August 30, 2009, she attended a baptism party for her grandchildren in Fontana. About 300 guests of all ages from infants to elderly persons had attended the party, but by midnight when the party was winding down, only about 60 guests remained, and people were starting to clean up. No one was dressed in baggy gang-banger clothing. Although alcoholic beverages were served at the party, no one seemed to be out of control with their drinking. Private guards provided security at the party.

Shortly after midnight, a scuffle occurred when two men pushed each other. A few minutes later, about 40 police officers ran in and started shoving people, knocking them to the ground, and hitting them. Maria heard the officers say things like, "'Stupid Mexicans.'" She did not see anyone throw anything at the officers or act aggressively. Officers fired rubber bullets at Maria, her daughter, and other guests. Maria saw one of her sons and defendant run toward the corral, and an officer knocked them down. Defendant put his hands out and pushed an officer to get around him; the officer punched defendant in the face, and defendant fell to the ground. Maria's son, Dorian Casillas, got between defendant and the officer, and officers knocked both of them over. While defendant was on the ground, an officer sat on him and hit him in the face. Defendant was turned over, and another officer hit him. Officers kicked him after he was

---

[4] Because several witnesses share last names, we will refer to them by their first names for clarity and convenience, and not intending any disrespect.

handcuffed and lifted him by his arms and dropped him. A police dog was released on Dorian and defendant. Defendant was very beaten up and had a lot of blood on his face.

Maria saw several people videotaping the events. A police officer came up behind a woman who was recording the police hitting a man on the ground, and the officer took the video recorder, put it in a nylon bag, and took it with him. Maria's daughter-in-law was also recording the officers who were beating defendant, and another officer took her camera and threw it on the ground. Maria's son, Jonathan Casillas, was holding his cell phone high in front of him in the direction where defendant was being handcuffed, and a police officer knocked the phone out of his hand. The phone broke, and the officer took it and did not return it.

Raven Lapetina testified he had been with defendant at the party the whole time. It was a family party, and they were not intoxicated. No alcohol was served after about midnight or 12:30, and only about 50 people were left at the party. Some people were cleaning up. A small scuffle occurred between two people, and a few minutes later, about 30 police officers came running in and started shooting beanbag guns.

A blond-haired officer sprinted toward defendant, grabbed him by the shoulders, and hit him with his knees in the back, slamming defendant into a wall. Defendant, whose back had been to the officer, started to turn around, and he swung, hitting the officer in the nose. Another officer ran up to Lapetina, hit him in the chest with a shotgun, and told him to get back. After defendant hit the blond officer, another officer slammed defendant to the ground and hit him. Another officer got on top of defendant and hit him with his knees. The two officers continued kneeing defendant on his neck,

8

shoulders, and head. A police K-9 was on top of defendant, biting him on the neck. Lapetina did not see defendant fight the officers; defendant was lying face down on the dirt screaming. Lapetina did not see anyone throw bottles, cans, or rocks at the officers, and he did not see a rock in defendant's hand when he hit the blond officer. Lapetina saw Jonathan Casillas using a cell phone to record the encounter and the dog attack when an officer came up and slammed the phone out of Jonathan's hand. The officer smashed the phone and kept stepping on it. Another officer hit a phone out of a person's hand with a baton when the person was pointing it toward the activity involving officers and defendant. Lapetina saw officers picking up cell phones and recording devices from the ground and putting them in a bag. Defendant had bruises and injuries to his face and torso that remained visible for three or four weeks.

Viviana Ortega was at the party with several family members, including her children. She did not know defendant. She saw 10 or 15 police officers arrive, and she saw Jonathan recording events with a cell phone. An officer approached Jonathan and slapped the phone to the ground. She heard Jonathan yell that the phone was broken and asked if anyone else had a phone. She did not know Jonathan before the event.

Coral Ortega attended the party with several relatives, including four young children. She did not know defendant. About 250 or 300 people had attended the party, but by the time the officers arrived, the party was winding down, people were cleaning up, and only about 100 people remained. Alcohol was served, but it was a family event; no one was belligerently drunk, and no one was wearing baggy clothing. Like other witnesses, she testified there had been a scuffle shortly before the police arrived. She

9

saw two officers walk toward the back of the party, and then she saw 8 to 11 officers with rifles. She did not see anyone throw anything at the officers or act aggressively toward them. Coral's husband had gone into a Porta-Potty, and when he came out, he was shot with a Taser, fell to the ground, and then was beaten. An officer put a gun to Coral's head when she tried to go to her husband and told her to get out of there. Coral was holding her four-year-old child when that occurred. She saw three recording devices being used, but she did not know the people doing the recording. She did not see any officer take recording devices or cell phones away from the people. Jonathan showed her his cracked cell phone.

Luis Chavez, a friend of defendant, was a guest at the party. People were drinking, but no one was out of control. By 12:30 a.m., the party was winding down; about 80 people were still there. A fight took place between two men, but the participants were kicked out and it was quickly over. A few minutes later, a few officers arrived, and shortly after that, about 30 officers swarmed in, running toward the party and pushing people out of the way. Chavez did not see anyone acting aggressively toward the police or throwing anything at them. He saw a tall blond officer approach defendant, who was talking with friends, and grab him by the shirt and push him away. Defendant put up his hands. The blond officer grabbed defendant, tossed him to the ground, got on top of him, and started hitting him. Two or three more officers began hitting defendant with hands and batons, while defendant was face down on the ground with his hands covering his head. Chavez saw a man using a cell phone to record the events, and an

10

officer told the man to put the phone away or the officer would take it away. The man complied.

David Caldera worked as a security guard at the party. He was not acquainted with defendant. About 300 or 350 guests, including children, had attended the party. Around midnight when Caldera left, about 280 guests remained. People were drinking but they were not acting intoxicated.

Michael Carrier testified that he was a friend of defendant's family, and he knew defendant to be "a very humble, loving kid, very respectful."

Maribel Davis testified she worked with defendant and was his friend. She knew him to be a truthful, nonviolent person who was respectful of authority.

## C. Rebuttal Evidence

The police dispatch log showed that 42 officers had responded to the party scene, but the officers had not all arrived at the same time.

An expert witness testified that officers are trained to order persons to put things down or to take steps to prevent objects from being thrown when items are thrown at them. The level of force is up to the officer and depends on the situation. Witnesses have a right to record police actions, and officers are not trained to knock recording devices out of witnesses' hands unless there is a threat the devices will be used as weapons against the officer. Based on reports of persons at the party throwing bottles and other items, it would be consistent with department policy for officers to knock items, including cell phones or cameras, out of peoples' hands. Officers are not trained to

11

stomp on recording devices or to seize and remove items. If an officer picked up a recording device to prevent it from being thrown, it should be booked as found property.

**D. Verdict and Sentence**

The jury found defendant guilty of misdemeanor assault on a police officer (§ 241, subd. (c)) as a lesser included offense to the charge of assault on a police officer with a deadly weapon (§ 245, subd. (c)). The jury found not true the allegation that defendant inflicted great bodily injury (§ 12022.7) and was hung on two additional counts of resisting an executive officer (§ 69). The trial court invited the prosecutor to converse with the jury after the jury was discharged, and the prosecutor thereafter represented to the court that the jury votes on those counts had been 11 to 1 and 10 to 2 in favor of acquittal. The trial court dismissed those counts on the People's motion under section 1385.

The trial court sentenced defendant to serve 180 days in jail.

### III. DISCUSSION

Defendant contends the trial court erred in refusing to instruct the jury with a requested instruction on willful destruction of evidence.

**A. Additional Background**

Defense counsel requested the trial court to instruct the jury on willful destruction of evidence as follows: "If you find that any police officer intentionally and willfully attempted to suppress material evidence by destroying cell phone or video recording of the officers' conduct and actions at the August 30, 2009 party at 15765 Santa Ana Avenue in Fontana, you must presume that the destroyed evidence would have shown

12

that the police officers were not lawfully performing their duties at the party and were instead using unreasonable or excessive force. If you find that any police officer destroyed this type of evidence, this alone can create a reasonable doubt about [defendant's] guilt on all charges."

The trial court stated it would not give that requested instruction but instead instructed the jury as follows: "'If you find any police officer intentionally, willfully destroyed any cell phone or video camera in this case, you may consider that evidence in determining whether or not there's a reasonable doubt to the defendant's guilt on all charges.'"

## B. Standard of Review

Defendant's proposed instruction addressed a factual issue raised by the evidence: did police officers deliberately destroy potentially exculpatory evidence. We review de novo whether the trial court properly instructed the jury on that issue. (*People v. Gurule* (2002) 28 Cal.4th 557, 659.)

Defendant's requested instruction also proposed a remedy in the event the jury found such destruction of evidence: a presumption of unlawful performance of official duties and an instruction that deliberate destruction of evidence could create a reasonable doubt. We review for abuse of discretion the remedy the trial court selects for destruction of evidence. (*People v. Zamora* (1980) 28 Cal.3d 88, 99 (*Zamora*).)

13

**C. Analysis**

### 1. Duty to Instruct

"A trial court must instruct the jury, even without a request, on all general principles of law that are "'closely and openly connected to the facts and that are necessary for the jury's understanding of the case." [Citation.] In addition, "a defendant has a right to an instruction that pinpoints the theory of the defense . . . .'" [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.) However, "[t]here is no requirement that the jury be instructed in the precise language requested by a party. [Citation.]" (*People v. Kegler* (1987) 197 Cal.App.3d 72, 80.) And it is not error to refuse to give a proposed instruction if other instructions adequately addressed the same point. (See, e.g., *People v. Zamudio* (2008) 43 Cal.4th 327, 361.) We will therefore focus on the adequacy of the instruction the trial court actually gave.

### 2. Obligation to Preserve Evidence

Law enforcement agencies have a constitutional obligation to preserve evidence "that might be expected to play a significant role in the suspect's defense." (*California v. Trombetta* (1984) 467 U.S. 479, 488, fn. omitted.) To fall within the scope of this duty, the exculpatory value of the evidence must be apparent before the evidence was destroyed, and the evidence must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id.* at p. 489.) A failure to preserve evidence done in bad faith constitutes a due process violation. (*Arizona v. Youngblood* (1988) 488 U.S. 51, 58.

14

Unlike in *Zamora*, where it was undisputed that the city attorney's office had destroyed records of complaints against police officers (*Zamora*, *supra*, 28 Cal.3d at pp. 96-97), the evidence in this case was controverted:  five eyewitnesses testified on defendant's behalf that they had seen police officers destroying cell phones or recording devices or ordering civilians not to use them; whereas, the police officers testified they had not seen anyone using cell phones or recording devices and had not seen such devices being destroyed.  Thus, the evidence presented a question of fact as to whether police officers destroyed material evidence.  (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1021.)  Both defendant's requested instruction and the instruction the trial court actually gave properly left that issue to the jury.

### 3.  Adequacy of Sanction

The second issue presented was the appropriate sanction if the jury found a due process violation had occurred.  In *Zamora*, *supra*, 28 Cal.3d at page 99, our Supreme Court held that the trial court has discretion to select an appropriate remedy.  In that case, citizen complaints against police officers had been destroyed, but the trial court found that the destruction of the complaints had not been in bad faith and refused to impose sanctions on the prosecution.  (*Id.* at pp. 93-94.)  The Supreme Court reversed, and in doing so, identified three factors for determining the proper sanction for destruction of evidence.  First, the court considered "'the particular circumstances attending [the] loss or destruction,'" and noted that if the destruction was lawful and proper, no sanction was warranted, but if the destruction was illegal and malicious, dismissal of the action might be appropriate.  (*Id.* at p. 100.)  Second, the court noted that "the sanction depends on the

15

materiality of the evidence suppressed." (*Ibid.*) Finally, the court stated that in imposing a proper sanction, "the courts must consider the impact of the sanction upon future cases and future police conduct." (*Ibid.*) Applying those principles, the court fashioned a remedy that addressed specifically the evidence lost to the defendant: "[U]pon remand of this case, the court should instruct the jury that [the officers] used excessive or unnecessary force on each occasion when complaints were filed against those officers, but that the complaint records later were destroyed. The court should also instruct the jury that [it] may rely upon that information to infer that the officers were prone to use excessive or unnecessary force [citation] and that the officers' testimony regarding incidents of alleged police force may be biased. [Citation.]" (*Id.* at pp. 102-103, fn. omitted.)

Similarly, in *People v. Wimberly* (1992) 5 Cal.App.4th 773, 793, the court approved an instruction to the jury that it "may" draw an adverse inference from destruction of evidence, and such adverse influence "may be sufficient to raise a reasonable doubt" as to certain counts. In that case, the trial court found the evidence had been destroyed under an existing policy, in violation of a discovery order, but not in bad faith. (*Ibid.*)

Here, the trial court instructed the jury that if it found police officers had willfully destroyed a cell phone or video camera, the jury could "'consider that evidence in determining whether or not there's a reasonable doubt to the defendant's guilt on all charges.'" Such evidence was material, because the defense to all the charges was that the officers were not lawfully performing their duties and were using excessive force. In

16

our view, that instruction imposed no meaningful sanction for a due process violation—even without that instruction, the jury could, of course, consider the police conduct, among all the other evidence, in determining whether the People met their burden of proving defendant's guilt beyond a reasonable doubt. The trial court's instruction did not inform the jury that it could draw an *adverse* inference from willful destruction of evidence (see *Zamora*, *supra*, 28 Cal.3d at pp. 102-103) or that such inference could be sufficient to raise a reasonable doubt as to defendant's guilt (see *ibid.*; see also *People v. Wimberly*, *supra*, 5 Cal.App.4th at p. 793). Thus, the trial court's instruction failed to consider "the impact of the sanction upon future cases and future police conduct." (*Zamora*, *supra*, at p. 100.) We conclude the trial court's instruction was an abuse of discretion.

### D. The Error Was Not Prejudicial

The People argue the instructional error is reviewable under the standard of *People v. Watson* (1956) 46 Cal.2d 818. However, in *People v. Yeoman* (2003) 31 Cal.4th 93, 126, the court assumed the People's loss of original photographs implicated the defendant's due process rights, and the error was therefore reviewable under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (See also *Zamora*, *supra*, 28 Cal.3d at p. 104, fn. 11 ["[S]ince suppression of evidence constitutes a violation of a defendant's due process rights [citations], it would appear that the proper test to be employed here is that enunciated in [*Chapman*] for errors of a constitutional nature. [Citation.]"].)

17

We nonetheless conclude the error was not prejudicial even under *Chapman.* As noted, defendant was convicted only of misdemeanor assault on a police officer as a lesser included offense to count 1. That count was based on defendant striking Officer McCoy in their initial encounter. However, *none of the defense witnesses testified there was anyone recording the events when Officer McCoy first encountered defendant*; rather, the witnesses testified the recording was taking place when defendant was already on the ground being kicked and beaten by the officers, being attacked and bitten by the K-9, or being handcuffed. Thus, based on the record before us, even if the trial court had instructed the jury it could draw an adverse inference that could lead to a reasonable doubt as to defendant's guilt if the jury found the officers had destroyed evidence, the instruction would not have been relevant as to count 1.

## IV. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

MCKINSTER
J.

CODRINGTON
J.

18