Filed 6/15/15  P. v. Bolduc CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058329 |
| v. | (Super.Ct.No. SWF10000399) |
| WILLIAM ROBERT BOLDUC, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge. Affirmed.

Matthew A. Siroka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant William Robert Bolduc guilty of (1) raping Jane Doe 1 (JD1), while she was prevented from resisting due to an intoxicating,

1

anesthetizing, or controlled substance (former Pen. Code, § 261, subd. (a)(3));[1]

(2) sodomizing JD1, while she was prevented from resisting due to an intoxicating, anesthetizing, or controlled substance (former § 286, subd. (i)); (3) sexually penetrating JD1, while she was prevented from resisting due to an intoxicating, anesthetizing, or controlled substance (former § 289, subd. (e)); and (4) two counts of engaging in oral copulation or sexual penetration with Jane Doe 2 (JD2), a child under the age of 10 (§ 288.7, subd. (b)).[2]

After the verdicts, the charges related to JD2 were reduced to the lesser included offense of participating in an act of sexual penetration with a person under 14 years of age, who is more than 10 years younger than the offender. (Former § 289, subd. (j).) Defendant and the prosecutor stipulated to defendant serving a 16-year term in prison, and the trial court imposed the 16-year term.

Defendant raises seven issues on appeal. First, defendant contends there is not substantial evidence to support the three convictions pertaining to JD1. Second, defendant asserts his right of due process was violated when he moved the court for a mistrial, the trial court refused to rule on the motion, the trial court explained to the prosecutor how to cure the alleged error, and then the court permitted the prosecutor to

---

[1] All further statutory references are to the Penal Code unless indicated.

[2] The jury found defendant not guilty of two counts of committing a lewd or lascivious act upon John Doe, a child under the age of 14 years. (§ 288, subd. (a).) The trial court granted a judgment of acquittal (§ 1118.1) on a charge that defendant used a concealed camera to photograph a person in a state of full or partial undress (former § 647, subd. (j)(3)(A)).

reopen the case. Third, defendant contends the trial court erred by admitting evidence of prior, uncharged, sexual offenses. (Evid. Code, § 1108.)

Fourth, defendant asserts the trial court erred in how it instructed the jury regarding the uncharged sexual offense evidence. (CALCRIM No. 1191.) Fifth, defendant contends the allegedly problematic instruction (CALCRIM No. 1191) lowered the prosecution's burden of proof, which resulted in a denial of due process. Sixth, defendant contends the trial court violated his right to a fair trial by admitting various pieces of evidence that were highly prejudicial. Seventh, defendant asserts the cumulative impact of the foregoing alleged errors resulted in a denial of due process. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### A.    CHARGED OFFENSES

#### 1.    *FACTS RELATED TO JD1*

In July 2009, JD1 and defendant met via an online dating website. JD1 was 35 years old and resided in Murrieta. Defendant was 54 years old, employed as a fireman, and resided in San Diego. JD1 and defendant's relationship became sexual. Defendant's sexual proclivities were different than JD1's sexual proclivities. For example, defendant wanted to engage in anal intercourse, "threesomes," and use sexual toys, while JD1 was not interested in such things. One time during their relationship, JD1 consented to anal intercourse; however, she found it painful so they stopped. JD1 told defendant she did not enjoy anal intercourse and did not want to do it again.

During their relationship, defendant often spoke about sex. Defendant continually tried to persuade JD1 to engage in sexual activities with which she was uncomfortable. Defendant wanted to engage in sexual intercourse every day, but JD1 did not feel the same. JD1 and defendant argued about sexual issues, such as the frequency with which they engaged in sexual intercourse.

In October 2009, defendant and JD1 attended an event at the fire station where defendant worked. The event was attended by "a lot of people," including defendant's coworkers. During the event, defendant proposed marriage to JD1. JD1 did not want to marry defendant, but said yes to his proposal because she felt pressured by the situation.

In late November or early December 2009, JD1 suffered an infected wisdom tooth. JD1 went to an oral surgeon, Dr. Smith, to have the tooth extracted. Dr. Smith required that JD1 have another person drive her home after the surgery. JD1 arranged to have defendant escort her home following the tooth extraction.

On December 9, during the oral surgery appointment, Dr. Smith administered several drugs to JD1. Dr. Smith gave JD1 10 milligrams of Valium, in order to ease JD1's anxiety related to the surgery. JD1 was given Versed intravenously; it is a controlled substance. Versed is like Valium but more potent and shorter-acting. Versed causes deep sedation and can cause memory loss. The memory loss relates to events that occur while under the effects of the drug. For example, a person may forget a conversation she has while under the effects of the drug. A comparison could be made to being drunk, and blacking out a portion of what occurred while inebriated. JD1 was also given Fentanyl, which is a short-acting highly-controlled narcotic. Fentanyl blocks

4

pain and deepens sedation. JD1 was also given a local anesthetic. Dr. Smith opined JD1 could be affected by the sedatives for up to four hours.

JD1's surgery lasted from approximately 2:20 p.m. to 2:51 p.m. JD1 had no memory of her tooth being extracted. When JD1 was discharged from Dr. Smith's care she was moved via wheelchair to defendant's vehicle. At the time of discharge, JD1 was "'alert and talking,'" which, in medical terminology, meant JD1 was not completely asleep when taken to the vehicle; JD1 was still in a state of "light sedation."

JD1 remembered being wheeled out to defendant's vehicle, but did not remember the ride home. JD1's home was 20 to 25 minutes from Dr. Smith's office. Defendant carried JD1 up the stairs at her residence. JD1 felt weak and lethargic. JD1 recalled sitting up in her bed. Defendant asked if JD1 wanted to wear more comfortable clothing. JD1 asked for her pajamas. JD1's next memory was of laying in her bed in her bra and panties. JD1 recalled feeling cold and hearing "clickings," like a camera shutter. JD1 remembered being under a blanket, lifting her head, and seeing the bottom of her blanket being raised.

JD1's next recollection was of feeling as though some "force" was rolling her onto her stomach. JD1 recalled feeling someone on the back of her legs and pressure in her vagina and anus. JD1 did not have the energy or ability to respond to what was happening to her. JD1's next memory was of defendant offering to get her medication and a milkshake; defendant left to get the items.

At 5:00 or 5:30 p.m., JD1 left her bed and walked to the restroom. At that point, JD1 was wearing pajamas. While walking, JD1 felt pain in her anus. Prior to urinating,

5

JD1 felt semen descend down her leg. JD1 still felt tired and had gauze in her mouth. JD1 believed she "was taken advantage of sexually without any consent."

When defendant returned to the residence, he fed a milkshake to JD1 because she did not have the energy to feed herself. Defendant sat on JD1's bed and said, "'Did you know you said you wanted to have sex?'" JD1 responded, "'Are you kidding me? I just had oral surgery. There's no way I would want that.'" Defendant said, "'Yes, you did. You just don't remember.'" Defendant lay on the bed with JD1. Defendant kissed JD1 and attempted to "make out" with her. JD1 pushed defendant away and said, "'Are you kidding me? You know, I'm in pain. I just had oral surgery.'" Defendant became upset and walked out of the bedroom. JD1 said, "'Get out of my house. I know what you did to me.'" Defendant left the residence, in order to feed his dogs.

At approximately 7:00 p.m., defendant returned to JD1's home. JD1 was more alert, but still had gauze in her mouth and was in pain. JD1 confronted defendant. JD1 asked defendant if they engaged in sexual intercourse. Defendant said they did not. JD1 told defendant she recalled hearing a clicking sound, and accused defendant of photographing her. Defendant "kept denying it," told JD1 she "was crazy," and said she "wanted to have sex."

At one of the points when defendant was away from JD1's residence on December 9, JD1 called defendant's telephone and attempted to leave a voicemail message, but defendant's voicemail was not set-up, so the message "bounce[d] back" to JD1's telephone. In the message, JD1 said defendant "took advantage" of her and she did not want him "around [her] anymore." JD1 told defendant, in the message, "You

6

can't, you can never stay away from me, sexually, even knowing I'm in pain and I just came out of surgery. You are sick. You have a sick mind. Go use it on someone else. Stay the hell away from me."

Later on the night of December 9 and/or the following day, defendant called JD1 and sent her e-mails. Defendant said and wrote that JD1 "was crazy" because "it never happened." JD1 began to feel as though "maybe it didn't happen." On December 10 JD1 told her therapist that defendant engaged in sex with her without her consent, and that she believed defendant photographed her while she was incapacitated. JD1's therapist advised her to end the relationship, report defendant, and stay with a relative. JD1 did not immediately report defendant because she "just didn't know what to do," in part because of the messages defendant left her saying he loved her and "would never do that to [her]." Two days after the oral surgery, JD1 took defendant with her to a Christmas party. JD1 took defendant to the party because her coworkers were expecting him to attend, and she did not want her coworkers to worry about her.

On December 15 JD1 ended her relationship with defendant. JD1's cousin was a fire chief. JD1 contacted her cousin, who told her to contact the police. JD1 called the police. A police officer went to JD1's house, where JD1 reported the December 9th assault. On December 16 Detective Dorcas requested JD1 make pretext telephone calls to defendant, in order to record defendant confessing to the assault. Defendant did not make any admissions during the pretext telephone calls.

During JD1 and defendant's relationship, on December 6th, defendant purchased a new mobile telephone from Best Buy. On December 11th, defendant returned the

7

mobile telephone to Best Buy. Best Buy gave defendant's returned telephone to Detective Dorcas. Agent Jarvis, of the Murrieta Police Department, performed a forensic analysis on the telephone. Jarvis located 24 photographs on the telephone. A second forensic investigation of the telephone uncovered a total of approximately 50 photographs. The photographs had been deleted from the telephone, but still existed on the telephone's digital memory card.

It appeared, from the telephone's data, that the photographs were taken on the afternoon of December 9th. The photographs included (1) JD1 asleep in defendant's car following her surgery; (2) JD1's vagina, wherein she is under a blanket, but the bottom of the blanket has been lifted to expose her genitalia; (3) JD1's buttocks, where it also appears she is on a bed; and (4) JD1's anus. There were also photographs of a finger penetrating a vagina, and what appears to be a penis penetrating a vagina. At trial, JD1 cried on the witness stand, and the prosecutor did not ask her to identify herself in the penetration photographs. JD1 did not remember the photographs being taken, and she did not consent to being subjected to such photographing.

### 2. *FACTS RELATED TO JD2*

In late May 2004, on Memorial Day, defendant met Laura Bolduc.[3] At that time, Laura was in the process of divorcing her husband, Tom T. Laura and Tom T. shared three children: (1) S.; (2) John Doe; and (3) JD2. S. was the oldest. John Doe was the

---

[3] Laura's last name is the same as defendant's last name. We use her first name for the sake of clarity, no disrespect is intended.

middle child. JD2 was the youngest child; she was born in October 2002. Laura was an alcoholic.

When they met, Laura and defendant began dating; their relationship became sexual within the first week. In November 2004, defendant and Laura began living together with Laura's three children. Laura and defendant married in August 2005. Immediately after the wedding, defendant became more controlling over Laura. For example, defendant would only permit Laura to speak to certain people and eat certain foods. Laura and the children were restricted from communicating with Tom T.

Defendant expected to engage in sexual intercourse four to five times per day. Laura did not want to engage in sexual intercourse that frequently. Defendant and Laura argued about sex. At times, defendant would wake Laura in the middle of the night and engage in sexual intercourse with Laura, without asking her.

Around Christmas in 2005, the children visited Tom T. in Idaho, where he resided. The children brought two disposable cameras with them. One of the cameras had been partially used, in that some photographs had already been taken with the camera. During the children's visit, Tom T. took photographs with the partially used camera. Tom T. took the camera to a store to have the pictures developed. When Tom T. went to the store to retrieve the photographs, he was informed the pictures had been given to the police.

Tom T. went to the police station. A police officer showed Tom T. photographs of JD2 and John Doe. Two photographs reflected the two children bent over, displaying their naked buttocks. Another photograph showed JD2 from the front, wearing a shirt,

9

but her genitals were exposed. Tom T. explained to the police that the photographs were not taken at his residence, he did not take the photographs, and some photographs had been taken with the camera prior to the children arriving in Idaho. Tom T. told the police officer it was possible S., the oldest child, had been the photographer, since she did not appear in the photographs. The police officer gave Tom T. the photographs. Tom T. kept the photographs in case there were any problems in the future related to his military security clearance due to being questioned by the police.

In October 2006, Laura called Tom T. so he could help her and the three children move away from defendant, due to the situation between Laura and defendant becoming "so bad." Laura and her children moved while defendant was at work. They went to Boise, Idaho, where Tom T. lived. Laura lived in a shelter in Boise, while the children lived in Tom T.'s home. Eventually, Laura returned to the house she shared with defendant, in California, but her children remained in Idaho with Tom T. When Laura returned, defendant began frequently taking sexual photographs of Laura.

The three children appeared happy when they moved to Idaho. After approximately six months, JD2 began lying "about everything." Additionally, JD2 was "always" crying. Tom T. asked JD2 why she was lying, but JD2 said she did not know. In 2009, Tom T. learned, from reading information on the internet, that defendant was charged with raping his fiancée (JD1). Within days, Tom T. told his children defendant had been arrested for being sexually "inappropriate."

Approximately one year passed, and JD2 was still lying on a regular basis. Tom T. again asked JD2 why she was lying. JD2 began sobbing. JD2 said defendant

10

touched her while she was living with Laura and defendant. Tom T. took JD2 to a counselor. After JD2 met with the counselor, the counselor informed Tom T. that she was required by law to report JD2's allegation. The counselor contacted police. Police in California contacted Tom T.

Police interviewed JD2. JD2 was eight years old during the 2011 interview. During the interview JD2 said that, when she was approximately three years old, she awoke to defendant's tongue entering her mouth. Defendant also touched JD2's genitalia with his hands, sometimes over her underwear, but other times defendant removed her underwear. Defendant digitally penetrated JD2's vagina and anus. On some occasions, defendant grabbed JD2's hand and caused her to rub his chest, his thighs, buttocks, and his penis. Defendant's clothes were typically removed, so JD2 had direct contact with defendant's skin. The touching typically started when JD2 was napping, so she would pretend to be asleep when defendant touched her.

JD2 testified at trial. JD2 was nine years old at the time of trial. JD2 said defendant touched her genitalia. JD2 confirmed she told the truth during the police interview.

B.     UNCHARGED OFFENSES (EVID. CODE, § 1108)

1.     *JANE DOE 3*

Jane Doe 3 (JD3) was defendant's biological sister. JD3 was eight years younger than defendant. JD3 was born in 1963. JD3 recalled four separate instances of defendant touching her in a sexual manner when she was six, seven, and/or eight years old. One instance occurred during a game of hide-and-seek. Defendant held JD3 down,

11

pulled down JD3's pants, and orally copulated her. During another instance, defendant covered JD3's face with a sheet, rubbed his penis on her, spit on her vagina, and ejaculated into a sock. JD3 also recalled a time when defendant purchased a bra, told JD3 to wear the bra, and said "he wanted [JD3] to French kiss him." When JD3 refused to kiss defendant, he said, "'This is what an older brother is supposed to do to his sister.'"

Around 1990, when JD3 was an adult, she told her mother about the foregoing incidents involving defendant; her mother discouraged JD3 from reporting the abuse. JD3 did not know why she did not tell anyone about the sexual touching when she was younger. When defendant was arrested in the instant case, her father informed JD3 that defendant had been arrested for rape. JD3 told her father that she was not surprised, and then researched the details of the allegations online. JD3 posted, in the comments of an online article, "'You finally got caught.'" A reporter put JD3 in contact with law enforcement.

2.    *JANE DOE 4*

Jane Doe 4 (JD4) and defendant were cousins. JD4 was 42 years old at the time of trial. In 1984, when JD4 was 14 years old and defendant was approximately 27 years old, the two were floating on a lake. Defendant moved his foot along JD4's leg, up to her vagina. Defendant's toes moved underneath JD4's bathing suit.

On other occasions, defendant invited JD4 over to babysit defendant's son. Defendant picked JD4 up for babysitting, but took her to empty homes that he knew were empty due to the family's real estate business. Defendant told JD4 she could be a

12

model, and took "a lot" of photographs of her. Defendant and JD4 engaged in sexual intercourse approximately six times. JD4 said she willingly engaged in intercourse with defendant.

In 1984, JD4 told another cousin, also a teenager, about her interactions with defendant. When JD4 was 19 years old, she told her boyfriend about her interactions with defendant. In 2002, JD4 told defendant's mother about her interactions with defendant. In 2011, JD4 told her own mother about her interactions with defendant. When JD4 heard about the instant case, she wrote a letter to Detective Dorcas.

> 3.    *Jane Doe 5*

Jane Doe 5 (JD5) was married to defendant.[4] JD5 and defendant met in 2001, when JD5 was 28 years old. When they met, JD5 was living with an abusive man. Defendant offered to help JD5. Defendant confronted the abusive man. JD5 stayed with defendant at defendant's mother's house. Immediately upon JD5 moving in, defendant and JD5 began a sexual relationship. Two weeks after meeting, defendant and JD5 married. JD5 contracted herpes from defendant, so she married him, in part, to use his insurance.

During the herpes medical examination, the person examining JD5 said, "'What has he been doing to you?' [¶] . . . You've got to get out of that. Like, 'I've never seen this.'" When leaving the examination, JD5 realized she "probably made the biggest

---

[4] JD5 was unable to identify defendant in court. When asked to look in defendant's general direction, JD5 said, "Is that him? He looks a lot different." However, she did say she was married to William Bolduc, who was a fireman.

13

mistake of [her] life" by marrying defendant. Three weeks into the relationship with defendant, JD5 began feeling frightened due to defendant constantly following her and asking where she was going. Also at the three week mark, JD5 told defendant she was not comfortable with some of defendant's sexual activities.

At times, JD5 awoke to defendant engaging in intercourse with her. JD5 would awake to defendant "putting his penis in every orifice [she] had." Sometimes JD5 would say "'no'"; however, defendant "wore [her] down," in that "[a]rguing with him was a futile and exhausting endeavor." JD5 explained that the arguments were exhausting because defendant "didn't listen to 'no.' He didn't hear 'no.' He didn't act on 'no.' Everything . . . was to meet his needs—always. He was insatiable really." When JD5 said no or "stop," defendant did not stop; defendant held JD5 down and continued to engage in sexual intercourse.

Defendant wanted to engage in sexual intercourse with JD5 "numerous times" throughout the day. Defendant enjoyed engaging in sexual intercourse when JD5 was sleeping or "on the edge of sleep." JD5 estimated that she awoke on a daily basis to defendant engaging in sexual intercourse with her.

JD5 separated from defendant, but defendant stalked her. Defendant threatened to humiliate JD5 by sending nude photographs of her to her employer. Defendant did send the nude photographs of JD5 to JD5's friends and family. JD5 filed for a restraining order against defendant. JD5 filed for divorce three or fourth months into the marriage. JD5 learned about the instant criminal case pending against defendant, and then researched details of the case online. JD5 contacted Detective Dorcas.

14

C.    DEFENSE

Defendant testified at trial.  Defendant admitted engaging in sexual intercourse with JD1 on December 9th, but asserted it was consensual.  Defendant explained JD1 was alert and awake when they engaged in intercourse.  Defendant denied sexually molesting JD2.  Defendant denied sexually molesting his sister, JD3.  Defendant denied engaging in sexual intercourse with his cousin, JD4.  As to JD5, defendant asserted JD5 contracted herpes from a prior relationship—not from defendant.  Defendant denied using physical force or violence against JD5.  Defendant also specifically denied using physical force or violence to sexually assault JD5.  Defendant was shocked when JD5 gave him divorce papers.

**DISCUSSION**

A.    SUBSTANTIAL EVIDENCE

1.    *CONTENTIONS*

Defendant asserts there is a lack of substantial evidence for his three convictions related to JD1:  (1) rape while the victim is intoxicated (§ 261, subd. (a)(3)); (2) sodomy while the victim is intoxicated (§ 286, subd. (i)); and (3) sexual penetration while the victim is intoxicated (§ 289, subd. (e)).  Specifically, defendant asserts substantial evidence does not support the findings that (a) JD1 was incapable of giving legal consent; and (b) defendant knew JD1 was not capable of giving consent.

15

## 2.    *STANDARD OF REVIEW*

"""When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.]'" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1322.)

## 3.    *JD1'S ABILITY TO CONSENT*

Defendant's three convictions related to JD1 involve similar language related to intoxication.  Specifically, the crimes require that the victim be "prevented from resisting" due to an intoxicating, anesthetizing, or controlled substance.  (§§ 261, subd. (a)(3), 286, subd. (i), 289, subd. (e).)  The issue presented by this element "is not whether the victim actually consented to sexual intercourse, but whether he or she was capable of exercising the degree of judgment a person must have in order to give legally cognizable consent." (*People v. Giardino* (2000) 82 Cal.App.4th 454, 462 [Fourth Dist., Div. Two].)  That means the three statutes require "only that the level of intoxication be such that the victim is incapable of exercising the judgment required to decide whether to consent to intercourse." (*Id.* at p. 464.)

Dr. Smith, JD1's oral surgeon, testified that JD1 was given Valium, Versed, and Fentanyl.  Valium is an anti-anxiety drug.  Versed causes deep sedation.  Fentanyl is a

16

"very potent" narcotic that deepens sedation. Dr. Smith opined JD1 could be affected by the sedatives for up to four hours. JD1's surgery lasted approximately 31 minutes, from 2:20 p.m. to 2:51 p.m.

When JD1 left the surgeon's office, she was moved via wheelchair to defendant's vehicle; she was in a state of "light sedation." JD1's home was 20 to 25 minutes from Dr. Smith's office. Defendant carried JD1 up the stairs at her residence.

While in bed, JD1 felt as though a "force" rolled her onto her stomach. JD1 felt someone on the back of her legs and pressure in her vagina and anus. JD1 did not have the energy or ability to respond to what was happening to her. Later, defendant offered to get JD1 medication and a milkshake; defendant left to get the items. At 5:00 or 5:30 p.m., JD1 left her bed and walked to the restroom. While walking, JD1 felt pain in her anus. Prior to urinating, JD1 felt semen descend down her leg. JD1 still felt tired and had gauze in her mouth. JD1 believed she "was taken advantage of sexually without any consent."

When defendant returned to the residence, he fed a milkshake to JD1 because she did not have the energy to feed herself. Defendant sat on JD1's bed and said, "'Did you know you said you wanted to have sex?'" JD1 responded, "'Are you kidding me? I just had oral surgery. There's no way I would want that.'"

The foregoing evidence reflects JD1 was under the effects of three different drugs designed to relax and sedate her. The drugs had the potential to last until approximately 6:00 p.m. Defendant had to carry JD1 up the stairs at her residence, and JD1 had to be moved via a wheelchair to defendant's car. This evidence reflects JD1

17

was affected by the drugs because she could not move on her own. The various sexual acts took place prior to 5:00 or 5:30, which was within the timeframe for JD1 to still be affected by the drugs. Further, it appears she was still affected by the drugs because defendant had to feed a milkshake to her due to JD1 being too weak to feed herself. All this evidence comes together to create a picture of a victim who was too weak and drugged to move.

A reasonable person could infer that if JD1 was too weak to move, then she was also too intoxicated to exercise the judgment required to decide whether to consent to intercourse. This inference is further supported by JD1's statement to defendant after the sexual acts occurred, wherein she said she explained there was "'no way'" she would have wanted to engage in sexual acts so soon after her surgery. This statement supports the inference because it reflects that JD1, if she had been capable of exercising judgment at the time, would not have consented to the sexual acts. Since the sexual acts did occur, one could reasonably conclude JD1 was too intoxicated to exercise the required judgment. Accordingly, we conclude substantial evidence supports the finding that JD1 was prevented from resisting due to an intoxicating, anesthetizing, or controlled substance.

Defendant contends the evidence is not substantial because the evidence does not establish JD1 was intoxicated, rather, it only establishes she suffered periods of amnesia. Defendant, relying on his own testimony, points to evidence reflecting JD1 was capable of walking and talking after her surgery and was only lightly sedated, to support his assertion that JD1 was capable of exercising the necessary judgment. As set

forth *ante*, under the substantial evidence standard of review, we must look at the evidence in the light most favorable to the verdicts. (*People v. Castaneda*, *supra*, 51 Cal.4th at p. 1322.) Defendant is looking at the evidence in a light unfavorable to the verdicts. As a result, we find his argument to be unpersuasive.

### 4. *DEFENDANT'S BELIEF*

The three crimes related to JD1 required that defendant knew or reasonably should have known JD1 was prevented from resisting due to being intoxicated. (§§ 261, subd. (a)(3), 286, subd. (i), 289, subd. (e).) Defendant asserts there is a lack of substantial evidence for the knowledge element.

Defendant drove JD1 home from the surgeon's office where she had surgery. The evidence reflects JD1 was moved via wheelchair to defendant's car. Photographs show JD1 sleeping in defendant's car after the surgery. Defendant carried JD1 up the stairs at her residence. After the sexual acts occurred, defendant fed a milkshake to JD1 because she did not have the energy to feed herself.

From the foregoing evidence, a reasonable trier of fact could deduce that JD1's intoxication was apparent to defendant. Defendant would have known of JD1's drug intake because he accompanied her to the surgeon's office. Defendant would have known JD1 was affected by the drugs after she left the surgeon's office because she slept in the car and required assistance going upstairs. Since defendant knew JD1 was intoxicated and having difficulty moving, a reasonable person could find defendant knew, or reasonably should have known, that JD1 was prevented from resisting due to being intoxicated. Further, one could reasonably find defendant knew JD1 remained

19

intoxicated for hours after the surgery since he volunteered to get her medications and a milkshake, and then fed her.  Defendant's acts with the medication and milkshake reflect knowledge that JD1 remained too intoxicated to leave the house and feed herself.  It can be inferred that if defendant knew JD1 was too intoxicated to feed herself hours after her surgery then he knew or reasonably should have known that, earlier in the afternoon, she was prevented from resisting sexual acts due to her intoxication.

### B.    MISTRIAL MOTION

#### 1.    *PROCEDURAL HISTORY*

JD2 was nine years old at the time of trial.  At the beginning of JD2's testimony, the prosecutor asked if JD2 was scared of defendant and if she was nervous.  JD2 admitted she was both scared of defendant and nervous.  The prosecutor then asked JD2 "easier" questions, such as whether she was on summer break from school and whether she had any pets.  The prosecutor asked if JD2 recalled going to a room and "talking to a lady about things that happened with [defendant]," i.e. the forensic interview.  JD2 said she recalled speaking to the lady about defendant.

The prosecutor said he would like to the play the video of the forensic interview.  The following exchange occurred:

"The Court:  Is there any reason why [JD2] needs to remain on the stand?

"[Prosecutor]:  I was going to—I was going to have her at the end of it articulate if what was on that was correct.

"The Court:  Haven't you laid the foundation already?

"[Prosecutor]:  I have.  [¶]  I will defer to the Court's discretion.

20

"The Court: Any objection?

"[Defense Counsel]: I have no objection to the witness being excused for the playing of the video."

JD2 left the witness stand, and the prosecutor played the video of JD2's forensic interview. When the video ended, court recessed for the weekend. When court resumed, the prosecutor questioned JD2 about her weekend. JD2 said she went to an amusement park. The prosecutor questioned JD2 about her experience at the amusement park. The prosecutor then questioned JD2 about a picture JD2 drew during the forensic interview. JD2 said the person in the picture with a sad face was JD2. JD2 said the prosecutor's questions were making her sad and that they were hard to answer. The prosecutor said he had no further questions.

Defense counsel requested a sidebar. Outside the presence of the jury, defense counsel (Whelton) moved for a mistrial. Whelton requested the trial court find JD2 to be unavailable because JD2 was unable to respond to questions and provide meaningful answers. Whelton explained the video of the forensic interview had been introduced pursuant to Evidence Code section 1360, which required corroborating evidence of the alleged abuse.[5] Whelton asserted there was no corroborating evidence in this case.

---

[5] Evidence Code section 1360 provides, in relevant part: "(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another . . . , is not made inadmissible by the hearsay rule if all the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [¶] (3) The child

*[footnote continued on next page]*

21

Whelton contended a mistrial should be granted because (1) defendant could not confront JD2, due to JD2 being unavailable; (2) the recording of the forensic interview was improperly introduced on the premise that JD2 was available; and (3) the forensic interview was so prejudicial (Evid. Code, § 352) that it was impossible for the charges involving JD2 to go forward.

The following exchange occurred:

"[Prosecutor]: Well, [JD2] is available, she's on the witness stand, and Mr. Whelton is free to cross-examine her. So I don't agree with his argument that she's unavailable as a witness. [¶] I'm not the only prosecutor who puts a victim on the witness stand for—makes them available for cross-examination and then relies upon the admissibility of the CARE/RCAT [forensic] interview, CARES video pursuant to [Evidence Code section] 1360. And I think just simply watching the CARES interview—or watching it establishes that, the way and manner in which it is done, that it complies with the requirements; that it is a[n] objectively reliable statement.

"There is a reason for [Evidence Code section] 1360. So we don't have to put little kids on the witness stand and have them recall the things—horror that happened to them in front of a jury.

"The Court: I disagree with that point. I don't think you get to put on the videotape and say 'there it is' because how can the defense cross-examine a child—

---

*[footnote continued from previous page]*
either: [¶] (A) Testifies at the proceedings. [¶] (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child."

"[Prosecutor]: She's sitting right there. He could cross-examine her on his—

"The Court: All she does is sit and stare at him? Doesn't answer any questions? Is that—is that a full opportunity to cross-examine?

"[Prosecutor]: I mean I—I don't think it's my obligation to assist Mr. Whelton in doing his cross-examination. If he's able to talk to her and ask her questions, then she can answer them.

"The Court: No. It is your obligation to put on evidence of the crimes charged.

"[Prosecutor]: Correct. And I think I have. I have asked the witnesses here— the foundation was laid for the CARES interview, and the CARES interview has been presented to the Court.

"The Court: So you're not going to ask this victim, alleged victim anything about any of the alleged acts that occurred?

"[Prosecutor]: Yes. That's—and I'm not—I understand from the Court's comments when we were doing 402s that's not how the Court—your Honor did things when your Honor was a prosecutor, and I've—I've talked to other D.A.s in the office, and many of them, when there's an admissible forensic interview, choose to present the forensic interview and choose not to ask—

"The Court: And just rest?

"[Prosecutor]: Yes. On the CARES interview. [¶] Burke Strunsky has done numerous trials in that fashion. That was—I have discussed it with Mr. Fineman, my supervisor.

"The Court: Have you got Ps and As on that?

23

"[Prosecutor]: I never had a defense attorney raise the issue and say it was inappropriate. The—the witness is available for cross-examination, and the CARES interview is a prior statement that's admissible pursuant to [Evidence Code] 1360. So that statement in and of itself is admissible as evidence. She's available for cross-examination. Her statement in the CARES interview is available for the jury to consider, and it is available for Mr. Whelton to cross-examine the witness on. [¶] And I don't think I'm obligated to then go into it all over again with her on the witness stand in front of the jury.

"Mr. Whelton: Your Honor, this is exactly what *Winslow* addressed. When a witness is present but the Court finds they are not available. 'Available' means that you have a meaningful opportunity to examine the witness. And if the witness just stands there or sits there and has no ability to answer the question because of their youth and because of the traumatic effect of the nature of the conversation, they are not available. [¶] That is where [Evidence Code] 1360 comes in. [Evidence Code] 1360 only makes it playable, one, if the witness testifies—

"The Court: I agree.

"Mr. Whelton: In this case they have not; or second, if there's corroboration.

"The Court: I think the whole statement needs corroboration, but if the witness just sits there and stares blankly off to space after giving their name, I don't think the People have met their foundation but—

"Mr. Whelton: And I believe the proper time for me to make the motion is now because the People have—I understood the People to finish their direct. So the

24

objection has to be made in a timely—has to be made timely is my understanding of the case law.

"The Court: Let me give the jury a 20-minute break and read this case law. The People need to think about where they are headed.

"[Prosecutor]: And I will review his case, your Honor. And if the Court decides I need to reexamine the witness, we can readdress that."

After the recess, the following discussion occurred:

The Court: "[Prosecutor], have you found a case that allows you to simply just put on a witness to talk about essentially her weekend activities and that's essentially it?

"[Prosecutor]: I—I don't have a case on point that says that, your Honor, but in reading—in reading [Evidence Code] 1360, as long as the circumstances of the statement provide indicia for reliability and the child testifies, then statement would be admissible and—

"The Court: Tell me what her testimony has been.

"[Prosecutor]: She testified to personal details about her life. She testified to knowing the defendant. She testified to being scared of the defendant. And, yes, I did not go into specifics and ask her about circumstances of the crime, but I don't believe that the law requires me to. The law states that if the interview is admissible and the witness testifies, it doesn't—[Evidence Code] 1360 does not require the victim or witness to testify about anything. It simply says 'if the child testifies at the proceedings.'

25

"The second element talking about corroboration is only if they are unavailable as a witness, and that's not the case here. She's not unavailable pursuant to [Evidence Code] 240. She's here on the stand. And while it may be hard questions for her to ask [*sic*], she hasn't been found in contempt.

"The Court: So it's the People's opinion of the law that if a sexual assault victim is interviewed at a forensic location, they then come to court and talk about their pets and nothing else that that is available—that's testifying in terms of [Evidence Code] 1360 because they talked about their pets and nothing else?

"[Prosecutor]: Yes. And normally the way I have the proceedings done is that the video is then played for the witness, and the witness often times has a chance to see it. In this case the Court excluded [JD2].

"The Court: No, I didn't exclude her. I asked if she needed to be on the stand.

"[Prosecutor]: The Court asked her to leave, and she—well, in terms—

"The Court: I didn't ask her to leave. I said, 'Is there any reason for her to be here during the video,' and the parties both said no.

"[Prosecutor]: Correct. And the Court's absolutely correct. [¶] As the Court's question, yes. I think that as long as she's on the stand and she is here testifying, there's nothing [that] says that I, as the prosecutor, have to ask her those questions and re-victimize her about what happened, and she's available to testify. She's available for cross-examination. Mr. Whelton now has a full opportunity to ask her about anything, including her prior statements.

"The Court: So what if she just sits on the stand and doesn't answer a question? Would you—would you consider her available for cross-examination?

"[Prosecutor]: Well, that remains to be seen if that's what she's going to do, but if she's—

"The Court: So you're—you want to go down that path of having the Court make that last-minute decision of whether or not she's had an—whether the defense has had an opportunity to cross-examine her as to the substantive allegations in this case? [¶] Based on our discussions in the hallway, I thought I missed something. So I called two senior judges who have more experience than I do, who spent their prosecutorial careers prosecuting child abusers, thinking I had missed something. [¶] And I haven't. So—

"[Prosecutor]: I could—I understand that the Court may disagree or frown on how I may be presenting the case, and I could only tell the Court I've—I've had extensi[ve] discussions with other prosecutors who are practicing in my office, one of which is Mr. Strunsky, who's in our SACA unit for quite some time, Ms. Garcia, who was in the SACA unit for quite some time, Mr. Fineman, who is the supervisor, and I've explained to them exactly what I have done and what has gone on here.

"I had a brief conversation again with them on the break about the fact that I have put the witness on, asked her essentially no questions about the offense, and have made her available for cross-examination, and they have all told me that that is how they routinely proceed with minor victims with the rationale being that it's the least—

27

while it may not be from the Court's perspective the way the Court would like to see it done—

"The Court: That's not—that's the least of my concerns right now—

"[Prosecutor]: Okay.

"The Court: —is that you would try a case the way I used to try a case. That has absolutely no input, no—it—it's the furthest thing from my mind. I don't care how you try your case as long as you try your case according to the law, to the rules.

"[Prosecutor]: I think I have.

"The Court: Well, having discussed with a judge in Riverside County and a judge from San Diego County who don't know each other, who have both had years of being child abuse prosecutors prior to their time on the bench, who are senior to me in terms of their prosecutorial experience and their time on the bench as a judicial officer, we all seem to disagree.

"And I don't know which judges have allowed this type of evidence to come in basically with just a statement that the child went to a theme park over the weekend and no discussion of the underlying charges. I don't know who that is, and I really don't care. I don't think that's the law.

"[Prosecutor]: I mean, is the Court—is the Court changing its ruling on the admissibility of the CARES interview pursuant to [Evidence Code] 1360? [¶] Because my understanding would be that that interview is admissible, and a foundation was laid for it, and the Court's had an opportunity to see it, that interview is admissible. And if

that interview is admissible, [Evidence Code] 1360 does not say that I have to ask the child—it just says testifies. It doesn't say as to what.

"The Court: So it's the People's view of the law that she testifies about going to a theme park over the weekend [and that] is sufficient for the playing of the [Evidence Code section] 1360 video?

"[Prosecutor]: In terms of—the requirement is that the child testifies at the proceedings, and there's no caveat that says testifies substantively to the circumstances of the offense. It simply says that she testifies, and she has, and she's fully available to cross-examine as to—albeit he's—I understand Mr. Whelton won't be asking her cross-examination about going to [an amusement park], but he can ask her any and every question he would like to about what she stated to—

"The Court: [Prosecutor], I'm shocked that the D.A.'s Office would—would have the position that as long as the victim gets on the stand and talks about some unrelated event and refuses to answer any questions about the charges facing the defendant and why—and what they are a victim of that they have met their obligations under [Evidence Code section] 136[0]. [¶] I'm blown away by it. I've never heard that argument by any prosecutor in my 17 years as a prosecutor and my four as a judge, I have never heard that.

"[Prosecutor]: I don't agree with the Court's conclusion that she's refusing to answer questions. I would agree that it appears that she's having a difficult time talking about the subject matter when we get close to the circumstances of the offense, but there's been nothing said by the witness during the course of my examination where she

29

has said or implied she's refusing to answer questions. It's obvious it's a difficult subject matter for her to talk about, which plays into my desire to not ask her specific questions and to rely upon the state of her prior admissible statement pursuant to [Evidence Code section] 1360.

"The Court: And in the Court's view of [Evidence Code section] 1360, a statement is admissible if the child is willing to testify about the nature of the charges. Even briefly—

"[Prosecutor]: Okay.

"The Court: —about what's on that videotape. [¶] If they are willing to talk about the interview itself and—I'm not going to tell you how to try your case, but you can kind of see where I'm headed. I don't expect there to be a full recitation of the entire evidence. I don't think that's required under the law. Mr. Whelton may disagree with me, but if she talks about the allegations in this case, what she talked about with the interviewer to the jury, then [Evidence Code section] 1360 comes in, and it should come in.

"But if the People think that they are going to be able to just put a witness on the stand and talk about their weekend at a theme park, not touching on the real issues in this case, and there being no other independent corroboration of the act, then we are in a quandary.

"[Prosecutor]: So it is the Court's—just so I understand the Court's position, the Court is not requiring me to go through each and every, per se, element of the offenses and force the victim to describe in detail the allegations? It's enough to broach the

30

subject and have her corroborate, in a sense, corroborate what's been previously stated in the CARES interview[?]

"The Court: She's got to talk about—she's got to testify about what the defendant did to her or the videotape.

"[Prosecutor]: If she has difficulty—this goes back to playing the video for the witness. If she expresses a hard time talking about the circumstance of the offense, I may re-request the Court to refresh her recollection with it.

"The Court: That's fine.

"[Prosecutor]: Which would require playing the video for her again, and then I could ask her if those things are true.

"The Court: The horse is out of the barn in terms of the videotape.

"[Prosecutor]: Right.

"The Court: So playing it another time I don't see is going to—is going to be a problem. Either she's going to be able to talk about that videotape and the abuse allegedly she has suffered at the hands of the defendant, or she's going to shut down, and she's not going to answer any questions from you or Mr. Whelton. In that case, you know, we are at a position where we need to decide how everyone gets a fair trial.

"[Prosecutor]: All right.

"The Court: I'm going to give you until—are you requesting any additional time?

"[Prosecutor]: I would like about five more minutes just so I could exchange videos in case we need to redo it and may briefly speak with the witness and explain to her what's going to happen."

The trial court gave the prosecutor additional time. The court asked if Whelton wanted to be heard. Whelton said he would submit, but asked for his motion to "be filed as part of the record." After the recess, Whelton objected to "any further presentation of the CARE video regarding [JD2]." Whelton asserted the Evidence Code section 1360 criteria had not been met, so the video was hearsay. Whelton also argued the video could not be used to refresh JD2's recollection in order to make the video admissible.

The trial court overruled Whelton's objection. The trial court explained that if JD2 testified about the abuse on her own or though use of the video, and the defense could cross-examine her, then the video would be admissible. The court said it would have the jury return to the courtroom and have JD2 retake the witness stand. The court then said, "[Prosecutor], I need you to make a motion to reopen," which the prosecutor did.

The prosecutor questioned JD2 about defendant touching her. JD2 said defendant touched the part of her body she used to urinate, and that the touching made her feel bad. JD2 said she recalled talking to the forensic interviewer. The prosecutor then requested JD2 watch the video of the forensic interview. JD2 agreed to watch the video. Whelton objected. At sidebar, the trial court said it did not see a need to show the video when JD2 was answering the prosecutor's questions. Ultimately, the

32

prosecutor showed a portion of the video to JD2. JD2 confirmed she told the truth to the forensic interviewer.

### 2. *ANALYSIS*

Defendant contends he was denied due process when the trial court declined to rule on his motion for a mistrial and instead guided the prosecutor on how to cure the error in laying the foundation for the video and then permitted the prosecutor to reopen his case. In particular, defendant asserts due process was denied because (1) the trial court did not rule on the motion for mistrial, and (2) the trial court aided the prosecutor, denying defendant of a neutral arbitrator.

We review rulings on motions for mistrial under the abuse of discretion standard of review. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.) However, a claim that a criminal defendant's constitutional right of due process was violated, and that his trial was fundamentally unfair, is subject to de novo review. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224-225, fn. 7.) Since defendant is primarily raising a due process argument, we will apply the de novo standard of review.

"A criminal defendant has due process rights under both the state and federal Constitutions to be tried by an impartial judge. [Citations.] Indeed, '[i]t is axiomatic that "[a] fair trial in a fair tribunal is a basic requirement of due process."' [Citation.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 455.) Another law of note is the doctrine of invited error: "[T]he doctrine of invited error operates to estop a party from asserting an error when the party's own conduct has induced its commission [citation], and from

claiming to have been denied a fair trial by circumstances of the party's own making [citation]." (*People v. Lang* (1989) 49 Cal.3d 991, 1031-1032.)

When the prosecutor announced his intent to play the recording of the forensic interview, defendant did not object. The trial court asked the prosecutor if the foundation for the recording had been laid, the prosecutor confirmed it had, but defendant said nothing about a possible lack of foundation. Defendant waited until after the recording had been played and after the prosecutor initially finished with JD2's direct examination to raise an issue with the recording's foundation.

By waiting until the prosecutor finished his direct examination, defendant invited a possible due process issue. Had defendant raised a timely objection, based upon a lack of foundation and/or hearsay, prior to the recording being played, the alleged due process problems would not have occurred. (See *People v. Panah* (2005) 35 Cal.4th 395, 476 [foundation and hearsay objections must be timely]; see also *People v. Kegler* (1987) 197 Cal.App.3d 72, 91 [objection should be raised at the earliest opportunity].) For example, had defendant raised a foundation and/or hearsay objection prior to the recording being played, the prosecutor could have laid the proper foundation without having to reopen his case, and without a motion for mistrial being mixed into the objection. Thus, the trial court's "failure" to rule on the motion for mistrial was invited error because defendant waited until the prosecutor finished his initial examination to raise what was essentially a lack of foundation or hearsay objection, which caused the trial court to treat the motion for mistrial as an evidentiary objection.

34

As to the judge informing the prosecutor of the need to question JD2 regarding the abuse, that discussion was necessary in order for the trial court to explain why the prosecutor had misinterpreted the law. The trial court did not question JD2 for the prosecutor or give the prosecutor exact questions to ask. The trial court tried, with as minimal suggestion as possible, to explain to the prosecutor why the prosecutor's understanding of Evidence Code section 1360 was incorrect. The trial court explained the type of questions it believed were required under the statute, e.g., questions about the charged offenses.

Trial courts are required to follow the laws set forth by the Legislature. (*People v. Lowe* (1975) 45 Cal.App.3d 792, 796.) In the instant case, the trial court was explaining to the prosecutor why, under the law, it might conclude the prosecutor failed to provide sufficient foundation. The trial court's explanation of the law does not amount to a due process violation because the trial court was merely trying to explain why the prosecutor was mistaken.

C     <u>EVIDENCE CODE SECTION 1108</u>

1.     *PROCEDURAL HISTORY*

Prior to trial, defense counsel moved to limit the testimonies of JD3, JD4, and JD5—defendant's sister, cousin, and ex-wife. At the hearing on motions in limine, the trial court said, "At this point, having read the moving papers of both sides, I do believe that the People have shown that this evidence is relevant not only for mental state, but also to show propensity, and that that probative value to the jury does not—is not—strike that—is not substantially outweighed by its prejudicial impact on the defense.

35

"And so those [Evidence Code section] 1108 witnesses of (Jane Doe 5), (Jane Doe 3), and (Jane Doe 4) will be allowed to be presented to the jury with the understanding that if, [defense counsel], if you believe at some point that it's becoming cumulative or that there has been a sufficient amount of evidence under [Evidence Code section] 1108, but now it's just, in a sense, piling on, and its probative value is dramatically dropping compared to its prejudicial impact on the defendant, then I invite you to make your objection, and I will hear it at that point." Defense counsel did not renew his objection during trial.

### 2. *ANALYSIS*

#### a) Contentions

Defendant raises two issues related to the uncharged sexual offense evidence. (Evid. Code, § 1108.) First, defendant challenges the general constitutionality of admitting propensity evidence. Second, defendant contends the trial court erred by admitting the specific propensity evidence used in this trial, i.e., the testimonies of JD3, JD4, and JD5.

#### b) Constitutionality

We address defendant's constitutional contention. Our Supreme Court has concluded the use of propensity evidence under Evidence Code section 1108 does not violate due process. (*People v. Falsetta* (1999) 21 Cal.4th 903, 917.) Defendant cites to *Falsetta* in his appellant's opening brief and concedes this court is bound by Supreme Court precedent. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.) However, defendant presents an argument as to why

*Falsetta* is incorrect. In particular, defendant asserts admitting propensity evidence under Evidence Code section 1108 violates due process. Defendant is correct that we must follow our Supreme Court's precedent. Accordingly, we conclude the use of propensity evidence, in the abstract, does not violate due process. (*Falsetta*, at p. 917.)

c)     Evidentiary Rulings

We now turn to defendant's contention that the trial court erred by admitting the propensity evidence presented in the instant case.

(1)     *Law*

"This court reviews the admissibility of evidence of prior sex offenses under an abuse of discretion standard. [Citation.] A trial court abuses its discretion when its ruling 'falls outside the bounds of reason.' [Citation.]" (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969.)

"Evidence Code section 352 gives a [trial] court the discretion to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1116.) Factors that a trial court should consider when deciding whether to allow the presentation of prior sexual offense evidence are: "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts;

37

(3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time.  [Citation.]"  (*Id.* at p. 1117.)

### (2)     *JD3*

JD3 was defendant's biological sister.  Defendant contends the evidence related to JD3 was minimally relevant to the charges concerning JD2, and the probative value was outweighed by the prejudicial effect of the evidence.

First, we examine the probative value of the evidence.  The evidence involving JD3 is relevant to the charged offenses involving JD2.  JD3 was approximately six, seven, and/or eight years old when defendant allegedly abused her, and JD2 was approximately three years old when defendant abused JD2.  The young age of JD3 helps to establish defendant's attraction to young girls, such as JD2.  Additionally, JD3 is defendant's sister, while JD2 was defendant's stepdaughter.  The relationship evidence involving JD3 helps to establish that defendant tends to victimize people close to him, such as relatives.

JD3 said defendant covered JD3's face with a sheet, rubbed his penis on her, spit on her vagina, and ejaculated into a sock.  JD2 said defendant grabbed JD2's hand and caused her to rub his chest, his thighs, buttocks, and his penis.  The act of rubbing both JD3 and JD2 is similar, and that similarity helps to support JD2's version of the events.

38

JD3 said defendant wanted JD3 to "French kiss him." JD2 said she awoke to defendant's tongue entering her mouth. The similarity of kissing both JD3 and JD2 with an open mouth helps to support JD2's version of the events. JD3 also testified that defendant pulled down JD3's pants, and orally copulated her. JD2 said defendant digitally penetrated JD2's vagina and anus. The acts of oral copulation and digital penetration reflect a sexual intent behind the acts of rubbing and kissing, which reflects the acts involving JD2 and JD3 were sexual in nature. In sum, JD3's testimony had probative value. In particular, it helped to support JD2's testimony.

Second, we determine whether the propensity evidence is stronger and more inflammatory than the charged acts. The propensity evidence was not stronger than the charged acts because both essentially involved the testimony of a single witness. JD3 testified about the alleged abuse against her. JD2 testified about the abuse against her, and JD2's father testified about the acting-out behaviors, such as lying, that led to JD2 ultimately disclosing the abuse. Accordingly, the evidence involving the alleged abuse against JD3 was not stronger than that involving JD2.

Next, in regard to the inflammatory nature of JD3's testimony, the acts involving JD3 were similar to those involving JD2: rubbing, kissing, direct genital contact. The acts involving JD3 were inflammatory because they involved sexual contact with a sibling; however, the acts involving JD2 were arguably equally inflammatory because JD2, while not defendant's biological relative, was younger, only three years old, at the time of the abuse. Thus, one could reasonably conclude the charged and uncharged offenses were equally inflammatory.

Third, we examine whether the uncharged conduct is remote or stale. JD3 was born in 1963. JD3 recalled four separate instances of defendant touching her in a sexual manner when she was six, seven, and/or eight years old. Thus, the evidence reflects the alleged abuse against JD3 occurred in 1970, 1971, and/or 1972. The charged offenses involving JD2 occurred in 2004 through 2006. Accordingly, there is approximately a 35-year gap between the charged and uncharged offenses.

Fourth, we consider whether the propensity evidence is likely to confuse or distract the jurors. JD3 was an adult at the time she testified, and was clear that the abuse occurred when she was a child. Meanwhile, JD2 was nine years old at the time of trial. Given the difference in JD2's and JD3's ages, it is unlikely the jury would be confused by the different offenses because there were clearly separate victims. Additionally, it was unlikely the evidence involving JD3 would distract the jurors from their main inquiry since the offenses involving JD3 were similar to those involving JD2. In other words, the jury would be no more tempted to punish defendant upon hearing the allegations involving JD3 since the allegations were quite similar to the allegations involving JD2.

Fifth, we examine the possibility of an undue consumption of time. The evidence involving the alleged abuse against JD3 was presented via the testimony of JD3. JD3's testimony consumes approximately 50 pages of a reporter's transcript that exceeds 1,500 pages.

Given the similarity between the charged and uncharged offenses, the equally inflammatory nature of the charged and uncharged offenses, the likelihood of jurors not being confused or distracted, and the presentation of the uncharged offenses not consuming much time, the trial court could reasonably conclude the evidence involving JD3 was admissible. The one factor that weighs against admissibility is the remoteness of the uncharged allegations. However, "'significant similarities between the prior and the charged offenses may "balance[] out the remoteness." [Citation.]' [Citation.]" (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 968.) As explained *ante*, there were significant similarities between the rubbing and kissing incidents in particular. Therefore, the one factor that could detract from admissibility was balanced by the similarity factor. As a result, the trial court acted within the bounds of its discretion by admitting the uncharged offense evidence related to JD3. We find no error.

(3)     *JD4*

JD4 was defendant's cousin. Defendant contends the evidence related to JD4 was marginally relevant, and that marginal probative value was outweighed by the prejudicial effect of the evidence.

First, we address the similarities. The offenses involving JD4 are similar to those involving JD2 because the charged and uncharged offenses involve young females with whom defendant had familial relationships:  cousin and stepdaughter. Also, JD4 said defendant touched her vaginal area with his toe. JD2 said defendant digitally penetrated her vagina. The touchings are similar in that they both involve a finger or toe touching a genital area.

41

Second, we determine whether the uncharged offense evidence was more inflammatory than the charged offenses. JD4 said she was 14 years old and defendant was 27 years old at the time of the alleged abuse against JD4. However, JD4 said she was a willing partner, to the extent a 14 year old can consent to such acts. Meanwhile, JD2 was an unwilling partner. Given that JD4 said she willingly engaged in sexual acts with defendant, the uncharged offense evidence could be considered less inflammatory than the evidence of the charged acts.

Third, we examine whether the uncharged acts are remote or stale. JD4 said the acts with defendant occurred in the summer of 1984. The alleged offenses involving JD2 occurred in 2004 through 2006. Thus, there is approximately a 20-year gap between the JD4 and JD2 acts.

Fourth, we consider whether the evidence involving JD4 was likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct. JD4 said that she was 14 years old when she willingly engaged in sexual intercourse with defendant. JD2 was three years old, unwilling, and did not engage in sexual intercourse with defendant. Due to these differences, it is unlikely the jury would confuse JD2 and JD4. Further, since the acts involving JD4 were approximately 28 years old by the time of trial, and JD4 said she willingly engaged in sexual acts with defendant, it is unlikely the jury would have been tempted to punish defendant for the acts involving JD4.

Fifth, we examine whether the evidence involving JD4 would consume an undue amount of time. The alleged acts concerning JD4 were presented via JD4's testimony. JD4's testimony consumes 30 pages of the reporter's transcript. The reporter's transcript in its entirety exceeds 1,500 pages. Accordingly, one could reasonably conclude JD4's testimony did not consume an undue amount of time.

In sum, the acts involving JD4 were similar to those involving JD2 because they both had familial relationships with defendant and were both touched in their vaginal areas. The acts involving JD4 were not more inflammatory than the charged acts. The JD4 acts were not confusing, not distracting, and did not consume an undue amount of time. The only factor that weighed in favor of excluding the evidence was remoteness. However, the remoteness factor can be balanced by the similarity factor. (*People v. Hernandez*, *supra*, 200 Cal.App.4th at p. 968.) The similarity between the familial relationships and touchings could reasonably balance the 20-year remoteness. Accordingly, we conclude the trial court acted within the bounds of reason by admitting the propensity evidence related to JD4.

(4) *JD5*

JD5 was defendant's ex-wife. Defendant contends the evidence related to JD5 was more prejudicial than probative.

First, we examine the similarity of the acts involving JD5 and those involving JD1. JD5 was defendant's girlfriend and wife, which is similar to JD1, who was defendant's fiancée. Thus, a similar relationship is involved. JD5 said that, at times, she awoke to defendant engaging in intercourse with her. JD5 would awake to

43

defendant "putting his penis in every orifice [she] had." JD1 said defendant engaged in vaginal and anal intercourse with her while she was intoxicated in bed. JD5's testimony supports JD1's statements because arguably, if defendant was having vaginal and anal intercourse with JD5 while she slept, then he would also engage in vaginal and anal sex with JD1 while she was intoxicated in bed because the situations are similar.

Additionally, JD5 said defendant photographed her while she was sleeping naked. JD5 was unaware of the photographs until a friend made her aware of them. Defendant had threatened to send the photographs to JD5's friends in order to humiliate JD5. Defendant's alleged act of taking photographs of JD5 while she slept naked is similar to defendant's alleged act of photographing JD1 while she was intoxicated.[6]

Second, we examine whether the evidence involving JD5 is stronger and more inflammatory than the evidence of the charged acts. JD5 said defendant held her down and continued engaging in intercourse with her after she told him to stop. It is debatable whether holding down a sentient rape victim is more inflammatory than raping an intoxicated victim who cannot resist. A reasonable person could conclude raping an intoxicated victim is more inflammatory because the intoxicated victim cannot defend herself.

In regard to the strength of the evidence, the evidence involving JD1 was stronger because while both JD1 and JD5 testified, there was photographic evidence to

---

[6] In the instant case, the trial court granted a judgment of acquittal (§ 1118.1) on a charge that defendant used a concealed camera to photograph a person in a state of full or partial undress (former § 647, subd. (j)(3)(A)).

support JD1's testimony. For example, there was a photograph of a hand on JD1's naked buttocks, which supports that her intoxicated recollections were accurate, in that she recalled a camera clicking while she felt cold in the bed.

Third, we consider whether the uncharged conduct is remote or stale. The acts involving JD5 allegedly occurred in 2001, which was eight years before the acts involving JD1.

Fourth, we examine whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct. In regard to confusion, both JD1 and JD5 testified at trial, so the jury could differentiate between the two women. JD5 was allegedly sleeping, then awake, then resisting intercourse with defendant. Meanwhile, JD1 was intoxicated and unable to resist intercourse with defendant. Given the different victims and different circumstances of the charged and uncharged rapes, it is unlikely the jury would be confused by the uncharged offense evidence involving JD5. As to distraction, it is unlikely the jury would seek to punish defendant for the alleged rape of JD5 because, as explained *ante*, the alleged crime against JD5 was not more inflammatory than the charged offenses.

Fifth, we address the possible undue consumption of time. JD5 testified about defendant raping her. JD5's testimony consumes approximately 40 pages of the reporter's transcript. As noted *ante,* the reporter's transcript exceeds 1,500 pages. A reasonable person could conclude that JD5's testimony was brief given the length of the trial, and therefore did not consume an undue amount of time.

45

In sum, the evidence related to JD5 was similar to the evidence involving JD1, in particular the photography aspect and the sleeping/intoxication rape aspects. The evidence involving JD5 was not strong, not more inflammatory, unlikely to confuse or distract the jurors, and did not consume an undue amount of time. The only factor in favor of excluding the propensity evidence was remoteness. However, the eight-year gap could be balanced by the similarities between the offenses. (*People v. Hernandez, supra*, 200 Cal.App.4th at p. 968 [similarities between the offenses can balance out the remoteness].) As explained *ante*, the photography and sleeping/intoxication aspects of the offenses were similar. A reasonable person could conclude these similarities balanced the eight-year remoteness. Accordingly, the trial court acted within the bounds of reason by admitting the evidence related to JD5 because nearly all the factors weighed in favor of admitting the evidence.

D.     <u>CALCRIM NO. 1191</u>

1.     *PROCEDURAL HISTORY*

The trial court gave the parties copies of its proposed jury instructions, including CALCRIM No. 1191. Defense counsel did not object to the instruction. The trial court instructed the jury with CALCRIM No. 1191, which provided:

"The People presented evidence that the defendant committed the crimes of Lewd Act with a Child under the age of 14 years and Lewd Act with a Child 14 or 15 years that (were) not charged in this case. These crimes are defined for you in these instructions.

46

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence *that the defendant was disposed or inclined to commit sexual offenses*, and based on that decision, also conclude that the defendant was likely to commit and did commit Lewd Act on a Child younger than 14 as charged in Counts 5 and 6 and Sexual Penetration of [a] Child younger than 10 as charged in Counts 7 and 8. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Lewd Act with a Child younger than years and Sexual Penetration of a Child younger than 10 years. The People must still prove each charge beyond a reasonable doubt." (Italics added.)

## 2. *ANALYSIS*

Defendant contends the CALCRIM No. 1191 instruction violated his right of due process and undermined the presumption of innocence by permitting the jury to find, based upon JD3's and JD4's testimonies, that defendant was disposed to commit sexual offenses in general. So, the jury could use the JD3 and JD4 evidence when deciding the

47

charges involving JD1 (an adult), rather than limiting the JD3 and JD4 evidence to deciding only the charges involving JD2 (a minor). Defendant notes the instruction informs the jury that the evidence provided by JD3 and JD4 is insufficient to prove defendant's guilt for the charged offenses against JD2 and John Doe (both minors); however, the instruction did not set forth a similar limit for the charged offenses against JD1. Defendant contends this failure to limit the use of the propensity evidence in connection to the JD1 charges lowered the prosecution's burden of proof. In sum, defendant contends the instruction incorrectly permitted the jury to conclude the offenses against JD3 and JD4 provided evidence of a disposition to commit the charged offenses against JD1, and the instruction failed to inform the jury that the prosecutor still had to prove the crimes involving JD1 beyond a reasonable doubt.

We review the adequacy of a jury instruction under the de novo standard of review. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) "'"In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*Ibid.*) Evidence admitted under Evidence Code section 1108 may only be used to prove a propensity to commit sufficiently similar charged acts. (*People v. Earle* (2009) 172 Cal.App.4th 372, 397.)

While we agree with defendant that the jury instruction could have been more precise in its language, we are not persuaded that the lack of perfect precision amounts to a due process violation. Accordingly, we conclude the trial court did not err. When the jury instruction is read as a whole, the proper rules were conveyed to the jury. The following instructional sentence could have been more exact in its language: "If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence *that the defendant was disposed or inclined to commit sexual offenses*, and based on that decision, also conclude that the defendant was likely to commit and did commit Lewd Act on a Child younger than 14 as charged in Counts 5 and 6 and Sexual Penetration of [a] Child younger than 10 as charged in Counts 7 and 8." (Italics added.)

Ideally, the italicized portion would have included a few more words, such as "involving minors," e.g., inclined to commit sexual offenses involving minors. Nevertheless, while the instruction permitted the jury to conclude defendant was disposed to commit sexual offenses in general, it limited the jury to using that conclusion in relation to finding guilt. The instruction only permitted the jury to use the general disposition conclusion to find defendant likely to commit the acts involving minors. The instruction did *not* permit the jury to use the general disposition finding in relation to the charges involving JD1. We make this conclusion based upon the following italicized language: "If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, *and based on that*

*decision, also conclude that the defendant was likely to commit and did commit Lewd Act on a Child younger than 14 as charged in Counts 5 and 6 and Sexual Penetration of [a] Child younger than 10 as charged in Counts 7 and 8.*"  (Italics added.)

In sum, because the instruction properly limited the jury's use of the general disposition conclusion, we are not persuaded that defendant's due process rights were violated.  When read as a whole, the instruction did not permit the jury to improperly use the general disposition conclusion in relation to the JD1 charges.

E.      BURDEN OF PROOF

Defendant contends the CALCRIM No. 1191 instruction violated his right of due process by impermissibly lowering the prosecution's burden of proof by permitting the jury to make an improper permissive inference for the JD1 charges.

"[I]nferences and presumptions create connections between basic/evidentiary facts and ultimate/elemental facts.  [Citation.]  'Ultimate' or 'elemental' facts prove the elements of the crime.  [Citation.]  By contrast, evidentiary or basic facts do not necessarily prove the elements of the crime.  [Citation.]"  (*People v. Van Winkle* (1999) 75 Cal.App.4th 133, 142.)  "Although inferences and presumptions form an integral part of the factfinding process, they infringe the due process clause of the federal Constitution if they undermine the jury's responsibility in a criminal trial to find the ultimate facts (i.e., the elements of the crime) beyond a reasonable doubt.  [Citation.]"  (*Id.* at pp. 142-143.)

"[P]ermissive evidentiary associations allow the jury to infer an ultimate/elemental fact based on the prosecutor's proof of a basic/evidentiary fact. [Citation.]" (*People v. Van Winkle*, *supra*, 75 Cal.App.4th at p. 143.) "'Because this [type of evidentiary association] leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the "beyond a reasonable doubt" standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference.' [Citation.] Permissive evidentiary associations must be evaluated 'as applied[,' as opposed to evaluated on their face,] because only in this limited situation is there any risk that a rational factfinder may make an erroneous factual determination, thereby undermining the jury's responsibility to find the ultimate/elemental facts beyond a reasonable doubt. [Citation.]" (*Ibid.*)

As explained *ante*, the jury instruction permitted the jury to conclude defendant had a disposition to commit sexual offenses in general, including those against adults, based upon the uncharged events involving minors. However, the instruction did not authorize the jury to use that conclusion in determining the ultimate fact of defendant's guilt in relation to the JD1 charges. The instruction only allowed the jury to use the inference in relation to the charges involving JD2 and John Doe. So, while the jury was permitted to make an inference, they were not allowed to use that inference in a manner that would have affected the reasonable doubt standard. Accordingly, we conclude the instruction did not create an improper permissive inference.

51

F.      PHOTOGRAPHS

1.      *PROCEDURAL HISTORY*

a)      Photograph of Defendant

Defendant moved in limine to exclude "[a]ll photographs of the defendant nude or engaged in sexual conduct not related to the alleged victims." (Evid. Code, § 352.) In the written motion, defendant asserted the images may cause the jurors to conclude defendant is sexually deviant, and therefore guilty of the charged crimes against the victims.

One of the photographs, Court Exhibit No. 5, which was later renumbered People's Exhibit No. 78, reflects defendant nude, on a wooden chair. Defendant is kneeling on the chair with the bottom of his feet and buttocks facing the camera; his torso is bent over the back of the chair. Defendant's hands are spreading his buttocks apart, so his anus is exposed. Defendant's hands are bound by handcuffs. The back of defendant's testicles and a portion of his penis are also exposed in the photograph. People's Exhibit No. 103 reflects two children, JD2 and John Doe, bent over at the waist, exposing their naked buttocks to the camera.

At a hearing on the motion, the prosecutor asserted the photograph of defendant bent over exposing his buttocks and anus was similar to the photographs of the children bent over exposing their buttocks. The prosecutor argued the similarity in the style of the photographs supported a finding that defendant posed the children and photographed the children.

52

Defense counsel argued there were no allegations that defendant photographed the children bent over—the children did not recall the photographs being taken—and there were no allegations that defendant photographed himself bent over. Defense counsel asserted that because there was no evidence defendant took any of the photographs, the photographs were not relevant.

The trial court excluded four of the five photographs of defendant—allowing Court Exhibit No. 5/People's Exhibit No. 78 to be admitted into evidence. The trial court said, "The Court finds that it is relevant because it shows a sexual interest in either the buttocks or the anus. The photographs included of the defendant as well as the children and of the women in the defendant's lives are consistent with a sexual interest in the buttocks or the anus. And, therefore, there is some relevance, and I don't believe that it's so prejudicial that it would outweigh the relevance on that issue. [¶] And so one photograph . . . will be allowed . . . ."

b.      Photographs of JD1

Defendant was charged with using a concealed camera to photograph a person in a state of full or partial undress (Count 4). (Former § 647, subd. (j)(3)(A).) After the prosecution rested its case, defense counsel moved for a judgment of acquittal on Count 4. (§ 1118.1.) Defense counsel asserted there was no evidence of the camera being concealed. The trial court granted defendant's motion for a judgment of acquittal. (§ 1118.1.)

53

Later in the trial, when discussing how to inform the jury of the judgment of acquittal, defense counsel asserted the photographs of JD1's buttocks and genitalia were more prejudicial than probative because Count 4 had been dismissed. (Evid. Code, § 352.) Defense counsel moved to exclude Exhibit Nos. 6 through 13 and 15 through 31 (the photographs). The exhibits had already been admitted, but defense counsel asserted they were no longer relevant and should therefore be excluded.

The prosecutor asserted the photographs were relevant to the remaining charges involving JD1, in that the photographs, and the data attached to the photographs, "established when the photographs started to be taken, when they ended being taken, the types of photographs taken, the volume of the photographs taken . . . . are completely inconsistent with some kind of consensual sexual activity." The prosecutor asserted the photographs were "extremely probative."

The trial court denied defendant's motion to exclude the photographs. The trial court explained, "I do find that they are highly probative of the underlying offenses in this case as charged in Counts 1 through 3 [pertaining to JD1]. They go to lack of mistake, intent, plan, mode of operation, common scheme—all those reasons. Those photographs are highly relevant, and so they will remain as exhibits.

2. *ANALYSIS*

a) <u>Contention</u>

Defendant contends his right to a fair trial was violated by the admission of the photograph of defendant bent over exposing his anus, and the photographs of JD1's

buttocks and genitalia, because the photographs were more prejudicial than probative (Evid. Code, § 352).

### b) Law

"Evidence Code section 352 states in pertinent part the court may exclude evidence if its probative value is substantially outweighed by the probability its admission will create substantial danger of undue prejudice. Evidence creates 'undue prejudice' when it '"uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues."' [Citation.]" (*People v. Roberts* (2010) 184 Cal.App.4th 1149, 1192.)

"'The weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules. [Citations].' [Citation.] '"The [trial] court's exercise of discretion under Evidence Code section 352 will not be disturbed on appeal unless the court clearly abused its discretion, e.g., when the prejudicial effect of the evidence clearly outweighed its probative value."' [Citation.]" (*People v. Roberts*, *supra*, 184 Cal.App.4th at p. 1192.)

### c) Photographs of JD1

JD1 was intoxicated when she was assaulted. JD1 said she recalled hearing "clickings," like a camera shutter. JD1 remembered being under a blanket, lifting her head, and seeing the bottom of her blanket being raised. JD1's next recollection was of feeling as though some "force" was rolling her onto her stomach. JD1 recalled feeling someone on the back of her legs and pressure in her vagina and anus. There was

evidence that the photographs were taken on the afternoon of December 9th, the day of JD1's surgery.

The photographs had strong probative value because they helped to confirm that JD1's recollections were accurate, as opposed to being drug-induced hallucinations. JD1 thought she recalled hearing a camera shutter repeatedly clicking, and the photographs helped to confirm her recollection was accurate. That confirmation gives credence to JD1's other recollections, such as the pressure she felt in her vagina and anus. Accordingly, the photographs were probative of the charged rape, sodomy, and penetration offenses.

The photographs were prejudicial because jurors may be uncomfortable with photographs of buttocks and genitalia. Given the strong probative value of the photographs, we conclude the trial court acted within the bounds of reason by finding the probative value of the photographs outweighed the prejudicial effect.

Defendant contends the volume of photographs of prejudicial. We disagree. JD1 testified that she heard "clickings," like a camera shutter. The volume of photographs was relevant because it showed she was intoxicated. When looking at the volume of photographs, it helps the jury to understand why JD1 may have heard the "clickings" despite being intoxicated—because the "clickings" were not a few clickings, but many. JD1 may have been intoxicated and going in and out of coherency, but there were so many photographs taken that, despite being intoxicated, she was able to have this memory of "clickings." Accordingly, the volume of photographs also had sufficient

probative value that the trial court could reasonably conclude it outweighed the prejudicial effect.

### d) Photograph of Defendant

Defendant was charged with sodomizing JD1. JD1 testified that she recalled feeling pressure in her anus while she was intoxicated. JD2 testified that defendant inserted his finger into her "bum." The photograph of defendant exposing his anus has probative value because it supports the testimony of JD1 and JD2 by helping to establish defendant's sexual interest in the anus. For example, the photograph creates an inference that if defendant touched JD2's anus, he likely did so with a sexual intent, rather than as a concerned stepfather.

The photograph is prejudicial because defendant is wearing handcuffs and posed in a manner that could cause people to conclude he is sexually deviant. While the photograph is somewhat prejudicial, it also has probative value. The trial court could reasonably conclude that the probative value of the photograph, in that it helped directly show defendant's interest in anuses, outweighed the prejudicial effect of the photograph especially in light of the other evidence related to defendant's sexual inclinations, e.g., Laura testified defendant "had a drawer next to [their] bed that had probably six to eight dildos or strap-ons in it," and he asked her to penetrate his anus with the dildos. Accordingly, we conclude the trial court did not err because it could reasonably conclude the photograph's probative value outweighed its prejudicial effect.

G.     CUMULATIVE EFFECT

Defendant contends the cumulative effect of the foregoing alleged errors resulted in a denial of due process.  We have found no errors, and therefore, there are no errors to cumulate.  As a result, we conclude defendant was afforded due process.  (See *People v. Duff* (2014) 58 Cal.4th 527, 562 [no errors, nothing to cumulate].)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER                                  
                                                                    J.

We concur:

HOLLENHORST                    
                    Acting P. J.

KING                                        
                              J.